UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.  2:18-cr-00165-JNL-1 |
| | ) | |
| | ) | |
| GEORGE ROYLE V | ) | |

### DEFENDANT'S MOTION TO DISMISS AND/OR TO SUPPRESS

Dated:  July 8, 2019

WALTER F. MCKEE
McKee Law, P.A.
133 State Street
Augusta, ME.   04330
(207) 620-8294
wmckee@mckeelawmaine.com

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................... **5**

**FACTS** ........................................................................................................................ **7**

    **I.**     **Defendant lived at 107 Craigie Street, a single-family home on a quiet, residential street in Portland, Maine.**................................................................ **7**

    **II.**     **SA Fife surveilled Defendant's home and work on seven separate occasions between July 1 and July 7, 2015.** ......................................................... **9**

    **III.**     **The government reportedly prepared, but SA Fife did not act on, a draft search warrant application.** ................................................................. **9**

    **IV.**     **The events of July 8, 2015.**............................................................................ **10**

        A.     Defendant and his son attended a Red Sox game in Boston..................... 10

        B.     SA Fife surveilled Defendant's house two more times, just three hours apart. ...................................................................................................... 10

        C.     SA Fife made a back-channel request to the Portland Police Department for a "welfare check." The request found its way to a senior police command officer. .................................................................................................. 11

        D.     According to SA Fife, officers entered and searched Defendant's residence without a warrant. ...................................................................... 13

        E.     But no Police Department record exists of a warrantless entry or search, or of any officer interacting with SA Fife. ................................................... 13

        F.     The only officer with a recollection recalls a "fed" telling him the nature of his criminal investigation, but does not remember entering Defendant's home....................................................................................................... 15

        G.     No one tried to find or contact Defendant, or let him know they had been at (let alone inside) his home. ..................................................................... 16

    **V.**     **The next day, SA Fife opened a case file; five days later he applied for a warrant without having done any additional investigation.** ........................... **16**

    **VI.**     **SA Fife led the execution of the warrant and seized only Defendant's laptop and personal phone.**..................................................................................... **17**

    **VII.**     **Defendant did not learn of the warrantless covert entry and search for nearly three years, and was misled by the contents of SA Fife's report.**................... **17**

**DISCUSSION** ................................................................................................................... **18**

    **I.**    **THE WARRANTLESS COVERT ENTRY AND SEARCH OF DEFENDANT'S HOME VIOLATED THE FOURTH AMENDMENT. ..... 19**

        A.    The Community Caretaking Exception Did Not Apply. ......................... 20

            1.    The First Circuit has not recognized "community caretaking" as an exception to the warrant requirement for entering and searching homes. ............................................................................................ 20

            2.    The community caretaking exception only applies to situations "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," which was not the case here. .......................................................................................................... 21

            3.    The warrantless entry here was not a reasonable exercise of "community caretaking" authority in any event. ............................. 23

        B.    The Exigent Circumstances Exception Did Not Apply. .......................... 25

        C.    In Addition, a Warrantless Covert Search Without Contemporaneous Notice is "Unreasonable" Under the Fourth Amendment. ....................... 28

    **II.**    **CONCEALMENT AND MISREPRESENTATION OF THE WARRANTLESS COVERT SEARCH VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS. ............................................................................................ 29**

        A.    Searches of Homes Impact Liberty, Property, and Privacy Interests. ...... 30

        B.    Covert Searches Require Heightened Due Process Protections. .............. 30

        C.    For Warrantless Covert Searches, Due Process Requires Even Stricter Measures to Ensure Timely, Meaningful Notice and an Opportunity to be Heard. ...................................................................................................... 32

        D.    SA Fife's Actions Deprived Defendant of Due Process. .......................... 34

            1.    SA Fife violated Defendant's right to procedural due process by avoiding judicial oversight and by preventing Defendant from having timely, meaningful notice and an opportunity to be heard regarding the July 8, 2015 warrantless covert entry and search. ............................ 34

            2.    SA Fife deprived Defendant of substantive due process by engaging in, avoiding oversight of, delaying notice of, and misrepresenting the July 8, 2015 warrantless covert entry and search. ............................ 38

**III.    THE COURT SHOULD THEREFORE DISMISS THE INDICTMENT. ... 41**

A.    SA Fife Knew or Should Have Known His Conduct Was Wrongful. ...... 41

B.    SA Fife Knew or Should Have Known Warrantless Covert Entries Require Scrutiny in Criminal Proceedings. ........................................................... 41

C.    SA Fife Knew or Should Have Known Concealment and Misrepresentation Would Impair Scrutiny of the Warrantless Covert Search. ..................... 42

D.    SA Fife's Purported Preparation of a Warrant Application Does Not Excuse His Misconduct; It Only Heightens the Need for the Scrutiny He Prevented From Happening. ................................................................................... 43

E.    Analogous Case Law Supports Dismissal as a Sanction for SA Fife's Constitutional Violations. ......................................................................... 44

    1.    "Pre-indictment Delay" Case Law Supports Dismissal as a Sanction. ........................................................................................... 44

    2.    Speedy Trial Clause Case Law Supports Dismissal as a Sanction. ... 46

F.    The Court Should Therefore Dismiss the Indictment. .............................. 48

**IV.    ALTERNATIVELY, THE COURT SHOULD SUPPRESS THE FRUITS OF THE JULY 13 SEARCH WARRANT. .............................................................. 49**

A.    *Murray v. U.S.* Imposes an "Onerous Burden" on the Government to Show The Fruits of the July 13, 2015 Warrant Are Admissible. ......................... 50

B.    Preparing a Draft Warrant Does Not Moot the *Murray* Analysis. ............. 52

C.    As a Matter of Law, the Government Cannot Meet Its "Onerous Burden" Because SA Fife Deprived Defendant and the Court of a Timely, Meaningful Opportunity to Assess the July 8, 2015 Warrantless Covert Search. ..................................................................................................... 53

D.    The Government Cannot Meet Its "Onerous Burden" as a Factual Matter, Either. ..................................................................................................... 54

    1.    SA Fife had ample opportunity and ability to seek a warrant but did not. ...................................................................................................... 55

    2.    SA Fife opened a case file only after the warrantless search. ........... 57

    3.    Steps taken to conceal and mischaracterize the warrantless covert entry constitute evidence of consciousness of wrongfulness of actions. ... 58

**CONCLUSION** .................................................................................................. 58

Defendant George Royle V ("Defendant"), by and through undersigned counsel, hereby moves this Court to dismiss the indictment in this matter or, in the alternative, to suppress the fruits of the search warrant issued on July 13, 2015, and states as follows.

## INTRODUCTION

On the evening of Wednesday, July 8, 2015, after dark, Homeland Security Investigations Special Agent David Fife ("SA Fife"), at the time the primary agent investigating this matter, manufactured a pretext to enter Defendant's home under the guise of a "welfare check" to conduct a warrantless covert search of the premises. SA Fife cited the home's allegedly "wide open" interior front door (which he had reportedly seen but not acted upon just hours earlier) as a reason to have "concern" for the "security" of the home and its occupants. But, the home's high-quality, locking storm door, installed only the day before, was closed, and the home was located in a safe neighborhood where screened-in doors and windows were a common sight on a warm summer evening.

SA Fife did not conduct the so-called "welfare check" himself. Instead, he used a back-channel to the Portland Police Department to ask them to do it for him, and told them about his investigation in the process. He reportedly waited 45 minutes outside Defendant's home for two patrol officers to arrive, and told at least one of them, too, the nature of his investigation of Defendant. He reportedly watched while the officers circled and entered Defendant's home, and when they emerged, questioned them about what they saw inside, by his own account learning they had seen, among other things, a laptop computer.

SA Fife opened an official case file on Defendant the very next day and wrote a materially misleading report about the previous evening's search. The following Monday, without conducting any further investigation, SA Fife obtained a warrant to search Defendant's home. He executed

the warrant the next morning and seized only the Apple laptop computer the police had seen and an iPhone (which was later returned to Defendant).

No one – not SA Fife, not the police, and not the U.S. Attorney's Office – told Defendant or any court about the warrantless covert search at the time. Defendant had no idea it had happened. For nearly three years, SA Fife kept the warrantless covert search secret from anyone other than law enforcement. When the government belatedly disclosed the search to Defendant in June 2018, it did so only in the form of SA Fife's materially misleading report, which further delayed discovery of the facts and legal issues discussed below until after Defendant was indicted in November 2018 and Defendant hired a private investigator.

The warrantless covert search violated the Fourth Amendment. The facts and circumstances of the search are therefore crucial to evaluating the admissibility of evidence that SA Fife seized a few days later under a search warrant. But, it is too late now to conduct a meaningful assessment of the totality of the circumstances of the warrantless covert search. Defendant has tried, to no avail. The police officers who went to his home that evening have no recollection of entering and searching it or of telling SA Fife what they saw inside, nor did they make a contemporaneous record of any such actions despite Portland Police Department policy requiring them to do so. No other police personnel remember the call. The only police record of the call, a single-page computerized dispatch record, does not corroborate – and appears to contradict – SA Fife's account.

Defendant had a due process right under the Fifth and Fourteenth Amendments to learn about and evaluate the facts and circumstances of the warrantless covert search in a timely and meaningful manner. SA Fife deprived Defendant of that right by concealing the search for nearly three years and by exacerbating the delay further by misrepresenting the search in his written report

of it. Defendant's right to a timely, meaningful opportunity to be heard about the impact of the warrantless covert search on the admissibility of evidence against him – a right that goes to the heart of his ability to defend himself – has been materially and irreparably impaired.

This Court should therefore dismiss the indictment. Alternatively, the Court should suppress all fruits of the later search of Defendant's home.

## FACTS

**I.      Defendant lived at 107 Craigie Street, a single-family home on a quiet, residential street in Portland, Maine.**

As of July 2015, Defendant lived in a single-family home at 107 Craigie Street in Portland, Maine. *See* Exhibit A, Affidavit of George Royle V ("Def. Aff.") at ¶ 1. He had purchased the home a year earlier, after a divorce. *Id.* at ¶ 8, 13. He and his ex-wife, who lived a block away at 84 Caleb Street in the couple's former marital home, shared equal custody of their two young sons. *Id.* at ¶ 10-14. The couple's divorce was a matter of public record. *Id.* at ¶ 9.

Defendant's home, pictured in Exhibit B as it appeared at the time he purchased it, sat back roughly fifty feet from Craigie Street. Def. Aff at ¶ 2. Its front yard was open to the street. A person could only access its backyard through the house, or through a chain-link gate accessible from a narrow walkway on the northerly side of the property. *Id.* at ¶ 3, 6.

On July 7, 2015, a workman from Loranger Window and Door installed a new storm door at Defendant's residence, replacing an older storm door.[1] *Id.* at ¶ 15.  The new door, pictured in Exhibit C as it appeared on July 14, 2015, had a fixed plexiglass panel on its bottom-half, and a sliding plexiglass panel on its top half. *Id.* at ¶ 16. The top panel could slide down to nest alongside the lower panel, revealing a screen in the top panel. *Id.* During the summer, Defendant kept the

---

[1] The older door is visible in Exhibit B, a photo taken by SA Fife before the door was replaced.

door in this "top-screen" configuration, such that the bottom half of the storm door comprised two, nested plexiglass panels. *Id.* at ¶ 19-21. The storm door had a deadbolt key lock and a metal, lever-style handle, all clearly visible in Exhibit C, and also visible from the further away, as pictured in Exhibit D. In contrast to some storm doors that can seem flimsy, the new door was relatively heavy and of high quality. Def. Aff. at ¶ 16-18. The door's manufacturer marketed the deadbolt lock as providing "security," and that was an important factor in Defendant's decision to purchase it. *Id.* at ¶ 16-21.

Defendant's home did not have air conditioning. *Id.* In the summertime, Defendant kept many of its windows – all screened – open to circulate air. *Id.* Defendant also often left the wooden, interior front door open behind the storm door, so that air could circulate through the screened portion of the storm door and through the house. *Id.* The door can be seen in this configuration in Exhibit C. Defendant purchased the new, substantial, locking storm door so that it could serve as the "front door" in the summertime. *Id.*

The neighborhood surrounding 107 Craigie Street was (and still is) quiet and residential. *Id.* at ¶ 7. The street was not heavily trafficked. *Id.* As in many Portland neighborhoods, neighbors knew and looked out for one another. *Id.* The neighborhood was also well-lighted. *Id.* at ¶ 4-6. A street light on a telephone pole directly across from 107 Craigie Street illuminated the front of the house and its front curtilage at night. *Id.* A similarly-powerful flood light affixed to a home abutting the rear of 107 Craigie Street illuminated most of Defendant's backyard.[2] *Id.*

_____

[2] That flood light has since been removed. *Id.*

8

It was and still is a common summertime sight in that neighborhood to see homes lacking air conditioning have open screened-in windows and open interior doors behind screened-in storm doors in the evening. *Id.* at ¶ 22.

## II.   SA Fife surveilled Defendant's home and work on seven separate occasions between July 1 and July 7, 2015.

According to his Report of Investigation titled "Case Initiation/Initial Investigation" dated July 9, 2015 (Exhibit E), on or about June 29, 2015, SA Fife allegedly oversaw the downloading of an illicit computer video file from an internet protocol ("IP") address located in Maine. After allegedly learning the IP address was assigned to Defendant at Defendant's residence, SA Fife reportedly surveilled Defendant's house on four occasions – July 1 (afternoon and evening), July 2 (morning), and July 6 (morning) – noting the presence of Defendant and his car there several times. *Id.* He also reportedly surveilled Defendant's car in the garage at Defendant's place of work on at least three occasions – July 2, July 6, and July 7. *Id.*

## III.   The government reportedly prepared, but SA Fife did not act on, a draft search warrant application.

According to information disclosed by the government in the past several days, on July 7, 2015 a government actor (it is, as yet, unclear who) reportedly created a "first draft" of an affidavit for SA Fife to use in applying for a search warrant for Defendant's home. The government also contends it had "completed" a warrant "application" before the events described below (a timeline that appears to conflict with SA Fife's records, also discussed below).

IV.    **The events of July 8, 2015.**

   A.    **Defendant and his son attended a Red Sox game in Boston.**

On July 8, 2015, Defendant and his seven-year old son accompanied friends – two adults and three children – to an evening Red Sox game in Boston. Def. Aff. at ¶ 23. The group traveled together in a single vehicle driven by one of the other adults. *Id.* at ¶ 24. The group left Portland around 3:00 p.m. *Id.* at ¶ 25.

   B.    **SA Fife surveilled Defendant's house two more times, just three hours apart.**

According to SA Fife, later that same day, at approximately 6:45 pm, he and a colleague, HSI Special Agent Gary Moulton ("SA Moulton"), allegedly surveilled Defendant's home for what was then, reportedly, SA Fife's fifth time in a week. Ex. E.

There were broken and/or scattered clouds over Portland between 6:45 p.m. and midnight on July 8, 2015, according to data from a weather station at Portland International Jetport archived by Plymouth State University, attached hereto as Exhibit F. The day had been warm, with temperatures reaching a high in the mid-80s late in the day. *Id.* The sun set at approximately 8:24 p.m. and last light was at around 9:00 p.m.

 The evening sun shone directly on the front of 107 Craigie Street in the summertime. Def. Aff. at ¶ 21. But, even in overcast conditions, from street level and without entering the curtilage, the reflection from the double panes of plexiglass would have made it difficult to see through the lower half of the door into a darkened house from fifty feet away. Exhibit D shows the reflection in the lower half of the door as being significant from about half that distance.

 SA Fife reported that when he and SA Moulton surveilled the house that evening, they "noted that the front door was wide open, no car was in the driveway, and many of the windows were open throughout the house. Children's toys were visible within the residence from the street

just beyond the front door."[3] Ex. E. In referring to the "front door," SA Fife meant the home's *interior*, wooden door, which SA Fife distinguished from what he called the home's "outer screen door" later in the same report.[4] *Id.* SA Fife and SA Moulton apparently departed after making these observations. *Id.*

Three hours passed. At approximately 9:45 p.m., SA Fife reportedly returned, alone and after dark, to 107 Craigie Street to surveil it again for the sixth time that week. *Id.* On this occasion, he "noted that the [interior, wooden] door remained wide open and all lights inside were off. *It did not appear that anything had changed at the residence since earlier in the evening*." *Id.* (emphasis supplied).

> ### C.  SA Fife made a back-channel request to the Portland Police Department for a "welfare check." The request found its way to a senior police command officer.

SA Fife's investigative report does not indicate where he went during the intervening three hours between his first and second surveillances of Defendant's home on the evening of July 8, 2015. Nor does the report explain why he decided to return to Defendant's residence alone, just after dark. But, SA Fife's report does describe how, purportedly "[o]ut of concern for the security of the home and its occupants," after observing the unchanged condition of the house again at 9:45 p.m., he "contacted the Portland Police Department to report his observations and request a unit conduct a welfare check." *Id.*

---

[3] Neither agent took a cell-phone picture or video of the house in this state at any time on July 8, 2015, apparently. *See* Exhibit G (email from Assistant United States Attorney denying existence of any photographs taken during surveillance).

[4] SA Fife also used the term "front door" to refer to the *interior* front door in his search warrant affidavit.

By its generalized reference to how SA Fife "contacted the Portland Police Department", the report gives the impression that SA Fife called the Portland Department's main dispatch number to "request … a welfare check." That is also what SA Fife claimed to have done when recently asked to specify who he had called at the Police Department. *See* Exhibit H (email from Assistant United States Attorney reiterating SA Fife's claim that he called dispatcher).

But that is not what happened. According to a response from the Portland Police Department to a Maine Freedom of Access Act ("FOAA") request, there is no record of SA Fife having called Portland Police dispatch directly that evening to report on the condition of Defendant's home, as there would have been had he called dispatch. Exhibit I, Affidavit of David Loranger ("Loranger Aff.") at ¶ 8. Instead, according to the only Portland Police Department record from that evening mentioning Defendant's home, at 10:06 p.m. (21 minutes after SA Fife purportedly "contacted the Portland Police Department"), the police dispatcher on duty took a call originating from within the Portland Police Department headquarters. The caller was Lieutenant Robert ("Bob") Ridge, a senior command officer,[5] and the call concerned the house at 107 Craigie Street. Exhibit J (the "CAD record"). Upon receiving the call, the dispatcher typed the following message into the Department's Computer Aided Dispatch ("CAD") system:[6]

> LT RIDGE CALLED AND REQUESTED FOR A WELL BEING CHECK TO SEE IF ANYONE IS IN THE BUILDING. HOUSE IS BEING WATCHED BY HOMELAND SECURITY AND THEY REQUESTED WE DO A RUN THROUGH OF THE HOUSE TO MAKE SURE NO ONE IS IN THERE

---

[5] *See* Loranger Aff. at ¶ 9-10.

[6] The CAD system links central police dispatch to "Mobile Terminal Devices" ("MTDs") in patrol cars, permitting dispatchers and officers to exchange messages and information about calls for service, and enabling officers to record contemporaneous information about the disposition of and events that transpire during calls for service.

*Id.* The dispatcher made no note of a "wide open" door at 107 Craigie Street in the CAD record. Nor did the dispatcher make any note of any purported exigency or emergency at Defendant's home, or of any reported concern for anyone's safety. The CAD record does not name SA Fife or any other Homeland Security agent. And, the CAD record contains no explanation for how it came to be that Lt. Ridge called the dispatcher that evening to order officers to enter Defendant's home without a warrant as requested by "Homeland Security."

According to the CAD record, at approximately 10:11 p.m., Portland Police Department Officers Jakob Demchak and Kevin Murphy were assigned to carry out Lt. Ridge's request. *Id.*

The limited evidence available conflicts on what happened next.

### D.   According to SA Fife, officers entered and searched Defendant's residence without a warrant.

By SA Fife's account:

> At approximately 10:30 p.m., two Portland Police officers arrived at the residence to conduct a welfare check due to the unsecured nature of the home. Officers circled the residence with flashlights and, seeing no signs of occupancy, knocked on the outer screen door. Receiving no response, the officers entered the residence through the open front door and walked through it to check on any occupants. Several minutes later, the officers exited, closed the front door, and returned to their vehicle. Following this, SA Fife spoke with the officers, who reported that no one was present in the home but that there were no signs of forced entry or other suspicious activity beyond the open door. Officers reported that they saw children's toys scattered throughout the residence and also noted a laptop and several televisions, leading them to believe that no one had been in the residence to steal or attempt to steal anything.

Ex. E.

### E.   But no Police Department record exists of a warrantless entry or search, or of any officer interacting with SA Fife.

In contrast to SA Fife's account, however, the police officers' CAD record tells a markedly different story. It shows the officers having arrived at Defendant's home at 10:48 p.m., and having made themselves "available" for a new dispatch just moments later. Ex. J. It says nothing about them having circled or entered Defendant's home, or of having talked to or shared information

with anyone. All the CAD record contains in terms of a description of what happened at Defendant's home is a two word "call disposition" notation that reads "Negative Contact." *Id.*

According to the Portland Police Department, other than the CAD record, no official "police report" exists for the call to Defendant's home that night. *See* Exhibit K. This is notable because Portland Police Department policy required officers to write reports "in situations *in which an officer takes some action* whether the action is self-initiated or in response to a citizen request for service." Exhibit L (police department standard operating procedure for police reporting) (emphasis supplied). Under any reasonable understanding of that instruction, an experienced officer would know to write a report after taking the undeniably significant "action" of entering and searching a home without a warrant, under cover of night, without the owner present, and of giving information about what he saw to a federal agent on-scene who was surveilling the house as part of a criminal investigation. *See, e.g.*, Loranger Aff. at ¶ 26, 29, 32, 38, 49, 53 (confirming this practice).

Even when situations did not call for a full report (such as when an officer did not take "some action" during a call for service), Portland Police Department policy also instructed officers to enter into their CAD dispatch log "more than one type of call disposition for a single call" when appropriate to describe what had occurred. *Id.* Officers were also "encouraged to add narrative details in CAD to provide an increased level of documentation" of a call. *Id.*

Thus, either the Portland Police officers did not take the actions SA Fife described in his own Report of Investigation, or they failed (contrary to clear Portland Police Department policy) to document a single fact reflecting that they had conducted a warrantless covert entry and search of a home, under cover of darkness, without the home owner present, to aid a federal criminal

investigation being conducted by an on-scene federal agent to whom they gave information about what they had seen inside.

### F. The only officer with a recollection recalls a "fed" telling him the nature of his criminal investigation, but does not remember entering Defendant's home.

The passage of time has made a meaningful investigation of that issue impossible. On March 28, 2019, Defendant's private investigator, David Loranger ("Loranger"), a retired police detective with decades of investigative experience, spoke with Officers Murphy and Demchak about their recollections, if any, of the events of July 8, 2015. Loranger Aff. at ¶ 13-32. Loranger showed both of them the CAD record they had a hand in generating. *Id*. Officer Demchak denied having any recollection. *Id*. Officer Murphy, generally remembered being told by a "fed" on-scene that the call concerned "kiddie porn." *Id.* He also recalled that Defendant's house was "dark." *Id.* But Officer Murphy said he did not recall entering or searching Defendant's home, even after having been told the substance of SA Fife's account of the search.[7] *Id.*

Loranger subsequently interviewed Lt. Ridge (the senior police command officer) and Joshua Dell'Aquila (the dispatcher who wrote the initial dispatch narrative). *Id.* at ¶ 33-55. Both Lt. Ridge and Mr. Dell'Aquila reviewed the CAD record, and Loranger also discussed the substance of the SA Fife's account with Lt. Ridge. *Id.* Neither had the slightest recollection of the events of July 8, 2015. *Id.* Lt. Ridge also denied ever knowing or working with SA Fife, which suggests he was not the person SA Fife purportedly "contacted" at the Portland Police Department that evening. *Id.*

---

[7] Loranger reported that Officer Murphy expressed surprise when told that the federal agent (SA Fife) had written a report saying police officers entered Defendant's home, insofar as Officer Murphy did not recall, and had not written any account of, having done so. *Id*.

Loranger found all of the Portland Police personnel he interviewed to be sincere and truthful in their efforts and inability to recall the events of July 8, 2015. *Id.* at ¶ 19, 32, 42, 55-56. Loranger believes that if he had had the opportunity to interview them within weeks or months of July 8, 2015, then it is highly likely he would have been able to obtain detailed information from them which they have now apparently forgotten. *Id.* at ¶ 57.

### G.      No one tried to find or contact Defendant, or let him know they had been at (let alone inside) his home.

One thing is clear, however: neither SA Fife nor the police officers made any effort to find out where Defendant or his children were that evening, or to contact Defendant. They did not interview Defendant's neighbors, and did not call Defendant or Defendant's ex-wife (whose contact information SA Fife reportedly possessed). They also did not leave notice that two police officers had entered and searched Defendant's home without a warrant at the behest of a Homeland Security agent. Def. Aff. at ¶ 29-31.

Defendant, his son, and their companions departed the Red Sox game around 10:00 p.m. *Id.* at ¶ 26. Defendant and his son arrived back at 107 Craigie Street shortly after midnight, unaware that just 90 minutes beforehand, law enforcement had been inside. *Id.* at ¶27-29.

### V.      The next day, SA Fife opened a case file; five days later he applied for a warrant without having done any additional investigation.

The next day, July 9, 2015, SA Fife officially opened a case file against Defendant and obtained a case file number for it, and wrote a Report of Investigation that contained a materially misleading account of the previous night's search. Ex. E. SA Fife did not report conducting any additional investigation between that date and July 13, 2015, when a fellow agent "approved" his initial Report of Investigation and SA Fife applied for and obtained a search warrant to search Defendant's residence and seize electronic devices. *Id.* The bulk of the specific facts laid out in

SA Fife's application for a search warrant repeated content from his July 9, 2015 Report of Investigation, with one notable exception: the application omitted any mention of the July 8, 2015 warrantless covert entry and search of Defendant's home and of SA Fife having asked and learned about what the Portland Police Officers saw inside.

The Magistrate approved the warrant the same day. The warrant authorized collection of all manner of electronic storage devices, including computers, thumb drives, external drives, CDs, and DVDs.

## VI.   SA Fife led the execution of the warrant and seized only Defendant's laptop and personal phone.

In the early morning of July 14, 2015, SA Fife, accompanied by fellow federal agents and local task force members, executed the search warrant at Defendant's home. Despite the relatively broad scope of the warrant, and despite finding and photographing numerous electronic storage devices at Defendant's home, agents seized *only* the laptop computer SA Fife reportedly learned about from the police officers on July 8, 2015, and Defendant's personal mobile phone (which they returned after Defendant was indicted). Ultimately, the *only* evidence seized that day, and on which the government bases its charge in this matter, purportedly consists of data forensically obtained from that very same laptop computer.

## VII.   Defendant did not learn of the warrantless covert entry and search for nearly three years, and was misled by the contents of SA Fife's report.

The government did not disclose the July 8, 2015 warrantless covert entry and search to a court or to Defendant at any time contemporaneous with when it occurred. Def. Aff. at ¶ 30-31. Although SA Fife memorialized his version of the events of the evening of July 8, 2015 in his July 9, 2015 Report of Investigation, he did not disclose that report, or any other information about the July 8 entry and search, to Defendant until almost three years after it happened. *Id.* at ¶ 32. Even

then, the government did not call attention to SA Fife's misleading characterizations of the warrantless entry; perhaps because the Assistant United States Attorney, like Defendant, initially credited SA Fife's vague and misleading description of the night's events, which contributed to further delay in Defendant beginning an investigation into the search. Def. Aff at ¶ 33-34.

## DISCUSSION

Government agents in this country cannot conduct warrantless covert entries and searches of people's homes and then, by keeping their actions secret from the home's occupants and the courts, remain unaccountable for them at will. This principle is so fundamental to our nation's legal and civic values that it is difficult to overstate. *See Carpenter v. U.S.,* 138 S. Ct. 2206, 2213-14, 585 U.S., 201 L. Ed. 2d 507 (2018) (discussing the Fourth Amendment's pre-Revolutionary roots in the Founders' desire to resist "arbitrary" abuses of police power such as  the hated "writs of assistance" that permitted "every petty officer" to enter and search Colonists' homes at will); *see also* Patrick Toomey and Brett Max Kaufman, *The Notice Paradox: Secret Surveillance, Criminal Defendants, & the Right to Notice*, 54:4 SANTA CLARA L. REV. 843, 847 (2015) *available at http://digitalcommons.law.scu.edu/lawreview/vol54/iss4/2* ("[I]t is unsurprising that throughout American history, criminal defendants rarely had to wonder whether their home, private papers, or other personal property had been searched by government agents. The very concept of notice as a matter of executive grace was difficult to fathom.").

And yet, that is what SA Fife, the principal investigative agent in this case, did here.

Specifically, SA Fife engineered and oversaw a warrantless covert search of Defendant's home in the late evening of July 8, 2015, five days before obtaining a warrant to search that same home. He knew full-well that the search was wrongful in the first instance, and that even if it had not been, Defendant needed to receive timely, meaningful notice of it in order to be able, among

other things, to evaluate the admissibility of evidence derived from any subsequent search. Nevertheless, SA Fife did not subject the warrantless covert entry and search to contemporaneous judicial supervision and did not provide Defendant timely or meaningful notice or opportunity to be heard about it. Instead, he kept the search a secret from Defendant for nearly three years and only then disclosed a misleading account that further exacerbated the delay.

The warrantless covert entry and search of Defendant's home violated Defendant's right not to be subjected to unreasonable searches under Fourth Amendment and Article 5 of the Maine Constitution.[8] SA Fife's concealment and misrepresentation of it violated Defendant's rights to due process of law under the Fifth and Fourteenth Amendments, and Articles 6 and 6-A of the Maine Constitution. The indictment should therefore be dismissed. Alternatively, because the government cannot as a matter of law or fact satisfy its "onerous burden" of proving that "no information gained" in the illegal search affected SA Fife's decision to seek a warrant five days later without any further investigation, all fruits of the later search must be suppressed.

## I.     THE WARRANTLESS COVERT ENTRY AND SEARCH OF DEFENDANT'S HOME VIOLATED THE FOURTH AMENDMENT.

"It is common ground that a man's home is his castle and, as such, the home is shielded by the highest level of Fourth Amendment protection." *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015). "Because the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home, a warrantless search of a private residence is presumptively unreasonable

---

[8] Defendant understands the protections afforded by the Maine Constitution to be at least as robust as those afforded him under the United States. Discussion of federal constitutional principles should thus be read to encompass the equivalent arguments under the Maine Constitution. *See generally* Jamesa J. Drake, *Reviving Maine's State Constitutional Protection Against Unreasonable Searches and Seizures*, 68 ME. L. REV. 321 (2016), *available at https://digitalcommons.mainelaw.maine.edu/mlr/vol68/iss2/3*.

unless one of a few well-delineated exceptions applies." *United States v. Delgado-Perez,* 867 F.3d 244, 251 (1st Cir. 2017) (quoting *U.S. v. Infante,* 701 F.3d 386, 392 (1st Cir. 2012)).

No exception to the Fourth Amendment's warrant requirement made the warrantless covert entry and search of Defendant's home on July 8, 2015 constitutional. Accordingly, it violated Defendant's Fourth Amendment rights.

### A.   The Community Caretaking Exception Did Not Apply.

In his July 9, 2015 Report of Investigation (Exhibit E), SA Fife characterized the July 8, 2015 warrantless covert entry into Defendant's home as a "welfare check" (also sometimes called a "well-being check"). In its use of that term, SA Fife's report seems calculated to invoke what is known as the "community caretaking" (or "community caretaker") exception to the Fourth Amendment's warrant requirement. "Community caretaking" is a "catchall [term] for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." *Matalon*, 806 F.3d at 634 (citing *U.S. v. Rodriguez-Morales*, 929 F.2d 780 (1st Cir. 1991)); *see also Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973) (articulating the "community caretaking" exception). The First Circuit has recognized "community caretaking" as an exception to the warrant requirement, but only in connection with searches and seizures of automobiles. *Matalon*, 806 F.3d at 634.

Here, the "community caretaking" exception cannot have excused SA Fife from obtaining a warrant before engineering a covert entry and search of Defendant's home on July 8, 2015, for several reasons.

> 1.   *The First Circuit has not recognized "community caretaking" as an exception to the warrant requirement for entering and searching homes.*

To start, the First Circuit has not recognized "community caretaking" as an exception to the Fourth Amendment authorizing warrantless entries into homes. Indeed, in the past five years,

20

it has twice expressly declined to do so. *See Matalon*, 806 F.3d at 634 ("The case law concerning community caretaking functions most often has involved actions by police officers with respect to motor vehicles. The doctrine's applicability has been far less clear in cases involving searches of the home … [W]e do not decide the question…") (internal citations omitted); *MacDonald v. Town of Eastham*, 745 F.3d 8, 15 (1st Cir. 2014) ("We do not decide today whether or not the community caretaking exception can be applied so as to render constitutional a warrantless and non-consensual police entry into a residence.").

District Courts in this Circuit which have recently analyzed this issue (in cases involving claims under 42 U.S.C. §1983) have recognized that the First Circuit has not extended the doctrine to homes but have also reached inconsistent conclusions about what that means. *Compare Castagna v. Edwards*, 361 F. Supp. 3d 171 (D. Mass. 2019) (reviewing case law from the 3d, 7th, 9th, and 10th Circuits rejecting "community caretaking" as an exception to the warrant requirement for home entries, and doubting it applies to home entries in this Circuit either) *with Caniglia v. Strom*, CA No. 15-525-JJM-LDA at n. 3, 2019 U.S. Dist. LEXIS 95400, 2019 WL 2358965 (D.R.I. June 4, 2019) (reviewing similar cases and concluding "the community caretaking defense could be applied in a home, depending on the facts of each individual case").

> 2. *The community caretaking exception only applies to situations "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," which was not the case here.*

Even assuming the community caretaking exception does excuse warrantless, non-consensual law enforcement entries into homes in Maine, the First Circuit prohibits its invocation to sanctify a warrantless entry and search conducted in the course of criminal investigative activities. "The [Supreme Court in *Cady v. Dombrowski*] took pains to define community caretaking functions as being 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' Cases that do not satisfy this requirement

fall outside the heartland of the community caretaking exception ….." *Matalon*, 806 F.3d at 634-35 (citing cases). Thus, "where [an] officer was indisputably engaged in an ongoing criminal investigation when the warrantless search occurred — the community caretaking exception does not apply." *Id.* at 636.

Here, "the record establishes beyond hope of contradiction that" SA Fife "was engaged in a quintessential criminal investigation activity" – surveillance – "when [he] ordered the search of [Defendant's] home." *Id.* at 635. According to his own account of events, SA Fife, in the midst of his second week of actively investigating whether Defendant had committed the crime with which he is now charged, effectively conducted a warrantless entry of Defendant's home by-proxy. While surveilling Defendant's home (for at least the sixth time in seven days), SA Fife made a back-channel request for local police officers to come over and enter Defendant's home without a warrant. His request resulted in a senior police command officer dispatching patrol officers with instructions to do what "Homeland Security" had asked – namely, to enter the home without a warrant to "make sure no one is in there." SA Fife communicated the nature of his criminal investigation to at least one of those officers, according to the officer's recollection of events. SA Fife also reportedly watched as the officers circled Defendant's home, and upon seeing "no signs of occupancy," entered Defendant's home after knocking on the "outer [storm] door" and getting no response. SA Fife waited for the officers to search and exit the home, and then interviewed them about what they had seen inside. SA Fife then included an account of the entry and search in his July 9 "Report of Investigation," specifically noting what the officers had told him about what they saw inside the house.

Far from being "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," the actions of law enforcement on July 8,

2015 were intrinsically and inescapably crime-investigative in nature from start to finish. *Cady*, 413 U.S. at 441, 93 S.Ct. 2523; *Matalon*, 806 F.3d at 635. As a result, the "community caretaking" exception did not excuse SA Fife (or the police officers) from obtaining a warrant.

> 3.  *The warrantless entry here was not a reasonable exercise of "community caretaking" authority in any event.*

Even if one were to accept, contrary to how SA Fife's own report and the Portland Police Department's CAD record describe them, that the events of July 8, 2015 were "totally divorced" from a crime-investigative function, SA Fife did not have any reasonable basis to believe entering and searching Defendant's house without a warrant constituted an exercise of any legitimate "community caretaking" authority that evening.

SA Fife wrote that he purportedly feared for the "security" of Defendant's home because, on a warm, summer evening, no one appeared to be home and the home's *interior* front door was open (behind a brand-new, closed, locking, storm door, a fact SA Fife conspicuously glossed-over in his report). But, as courts across the country have recognized, "[t]he mere discovery of an 'open door' of a residence—absent some other reason for concern—'is not, *in and of itself,* a circumstance that could give rise to a reasonable belief that entry is necessary to prevent harm to persons or property.'" *Kyer v. Com.*, 612 S.E.2d 213, 218 (Va. Ct. App. 2005) (rejecting "community caretaking" exception as justification for a warrantless search of a house with its door standing "wide open" on a summer evening, and citing *State v. Christenson*, 45 P.3d 511 (Or. Ct. App. 2002)); *see also McInerney v. King*, 791 F. 3d 1224, 1235 (10th Cir. 2015) ("[I]f the nonspecific and dated information from [a home occupant's ex-husband about her history of drug and alcohol abuse] plus a messy house and open doors and windows when the weather is warm could justify the entry that morning, it could have justified an entry on almost any occasion"). After all, SA Fife did not even know whether Defendant's house was locked, or whether a car was

in the garage, nor could he have without first entering the curtilage of Defendant's home after daylight hours and peering into the garage and trying the handle of the closed storm door.[9]

Even when courts have entertained a "community caretaking" exception to the Fourth Amendment allowing law enforcement to enter a home with an open front door, the circumstances have been so markedly different from those here that they only emphasize how unreasonable it would have been to rely on a "community caretaking" rationale to enter Defendant's home on July 8, 2015 without a warrant. *See e.g., MacDonald*, 745 F.3d at 10 (officers cloaked in qualified immunity because they received a report from and interviewed a "concerned" neighbor before conducting an illegal, warrantless search of home with open door); *People v. Lemons*, 830 N.W.2d 794, 799 fn. 2 (Mich. Ct. App. 2012) (the "unusual" sight of an open door blowing in wind on a November weekday afternoon in Michigan excused officers from obtaining a warrant); *State v. Alexander*, 721 A.2d 275, 124 Md. App. 258 (Ct. Spec. App. 1998) (exception applied where anonymous caller on Thanksgiving Day reported an open basement door at neighbor's house while neighbor was known to be out of town).

Here, in contrast to those cases, nothing about the appearance of the house at 107 Craigie Street on the evening of July 8, 2015, as SA Fife described it, would have made a reasonable person, much less an experienced police officer, think anything was amiss. *See* Loranger Aff. at ¶ 52. There was no sign of forced entry or of foul play; it was not cold outside or otherwise inclement; it was not inordinately late at night; and it was not odd to see a house with no air

---

[9] It makes no difference that no one was home and the storm door (apparently) turned out to be unlocked. The Fourth Amendment doesn't authorize law enforcement to go around at night peering into garages and trying the doors to people's homes to see if they open, and if they do, to enter without permission or a warrant to look around. To the contrary, such actions would arguably constitute criminal trespass under Maine law. *See* 17-A M.R.S. §602(1)(A) ("A person is guilty of criminal trespass if, knowing that that person is not licensed or privileged to do so, that person … enters any dwelling place.").

conditioning in that neighborhood have its screened-in windows and interior door open to circulate air. Over the course of the three hours between SA Fife's two surveillances of the home that evening, he reported nothing appeared to have changed. And, perhaps most importantly, no neighbor or other disinterested member of the "community" had reported anything out-of-the-ordinary at Defendant's home.

Additionally, no contemporaneous police record exists reporting any condition at Defendant's home that raised concern for the officers who responded to SA Fife's call (nor did the dispatcher's narrative in the CAD record alert them to any such condition). To the contrary, the officers went to Defendant's home with explicit instructions from a senior police command officer to enter the home because "Homeland Security … requested" they do so. Ex. J. The only person purportedly harboring "concern" about the "security" of Defendant's residence and its "occupants" that evening was SA Fife, who had an investigative interest in Defendant's home, was actively surveilling it, and who went about calling-in the police, informing of them of his investigation, observing their actions, and questioning them, in a manner wholly inconsistent with someone who had a good faith, non-crime-investigative concern for a home's "security."

## B.   The Exigent Circumstances Exception Did Not Apply.

The second exception the government might try to invoke as an excuse for SA Fife failing to obtain a search warrant before engineering and overseeing a warrantless covert entry and search of Defendant's house on July 8, 2015, is the exception for "exigent circumstances." Courts have recognized "exigent circumstances" as an exception to the warrant requirement in "those situations in which some compelling reason for immediate action excuses law enforcement officers from pausing to obtain a warrant. … Examples of exigent circumstances include: (i) hot pursuit of a fleeing felon; (ii) threatened destruction of evidence; (iii) risk the suspect will escape undetected; (iv) threat posed by the suspect to the safety of police or the public; (v) and the need to give

25

emergency aid." *U.S. v. Leonard*, No. 2:17-CR-77-NT, 2017 U.S. Dist. LEXIS 179075, 2017 WL 4899124 (D. Me. Oct. 30, 2017) (suppressing evidence in light of government's failure to show exigent circumstances). Although there is some confusion between the two concepts in other judicial circuits, the First Circuit distinguishes "exigent circumstances" from "community caretaking" in that the former involves an entry and search for explicitly crime-investigative and evidence-gathering purposes under circumstances where there is no time to get a warrant, whereas the latter excuses obtaining a warrant because it has *nothing* to do with investigating a crime at all. *Matalon*, 806 F.3d at 635-36.

Here, although SA Fife's entry and search by-proxy was quite obviously crime-investigative in nature, the "exigent circumstances" exception did not apply because, simply put, there was no exigency and no one acted as if there was.

As discussed above, although SA Fife, in his July 9, 2015 Report of Investigation, alluded to a concern for the "security" of Defendant's home and its inhabitants, nothing about the scene he observed at 107 Craigie Street on the evening of July 8, 2015 suggested anything out-of-the-ordinary, much less that there was a pressing need to enter the home to obtain evidence before a warrant could be obtained. Neither SA Fife nor the police officers reported any fact reasonably indicative of any exigent circumstance. *See, e.g., State v. Fultz*, 189 So. 3d 155, 160 (Fla. App., 2d Dist. 2016) ("an open front door alone is not enough to support a reasonable belief that an exigency exists and cannot justify a warrantless entry into a residence"). Had SA Fife possessed any such "exigent" facts, it is safe to assume he would have mentioned them in his Report of Investigation, and that the police dispatcher would have alerted patrol officers to them. There are no such facts reported in the Report of Investigation or the CAD record.

What's more, no one acted as if there was an exigency that evening requiring immediate entry at 107 Craigie Street to gather evidence before a warrant could be obtained. Courts apply the "exigent circumstances" exception only when "the police … reasonably believe that there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *U.S. v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005).  Here, in stark contrast, SA Fife did not act as if the open interior door at Defendant's home presented any kind of exigency. After all, he and a fellow agent reportedly observed Defendant's house in its purportedly "unsecured" state at 6:45 p.m., but he took no action until he returned (alone, after dark) and saw an identical scene at 9:45 p.m.[10] SA Fife also, according to his account, did not enter the home himself or call 911, as one might imagine he would have had he truly believed the there was an imminent risk of destruction of evidence or other emergent situation that could not wait for him to obtain a warrant. Instead, SA Fife called-in the Portland Police Department via a back-channel, and his request found its way to a senior police command officer, who in turn called a dispatcher, who in turn dispatched the two officers. It took approximately 21 minutes for that process to happen (assuming SA Fife made his call at 9:45 p.m. as he claimed), and another 23 or 37 minutes for officers to arrive on scene (depending on whose time of arrival you credit as accurate, SA Fife's or the officers', respectively)

---

[10] To the extent the government might contend, contrary to fact, that the passage of time created an "exigency," it would in any event be one of SA Fife's own making (having waited three hours after seeing the purportedly "unsecured" state of the home, and until after darkness fell, before acting), and thus could not serve as a constitutional basis for warrantless entry. *U.S. v. Curzi*, 867 F.2d 36, 43 n.6 (1st Cir. 1989) ("Circumstances deliberately created by the police themselves cannot justify a warrantless search.").

– a timeline that undermines any suggestion of the sort of urgency required for "exigent circumstances" to exist.[11]

Accordingly, no exception to the Fourth Amendment excused SA Fife from obtaining a warrant before engineering the warrantless covert entry and search of Defendant's home on July 8, 2015.

**C.     In Addition, a Warrantless Covert Search Without Contemporaneous Notice is "Unreasonable" Under the Fourth Amendment.**

In addition to there being no constitutionally-permissible excuse for SA Fife's failure to obtain a warrant, the July 8, 2015 warrantless covert search of Defendant's home also violated the Fourth Amendment because SA Fife never gave reasonably contemporaneous notice of it.

To be sure, the "prevailing view" in the federal courts is that a violation of the routine procedures for giving "notice" (or its equivalent) under Rule 41 (and similarly under 18 U.S.C. §3103a) does not *per se* amount to a violation of the Fourth Amendment. *See, e.g.*, *Burbank v. Kirkconnell*, No. CV418-294, 2019 U.S. Dist. LEXIS 45936, 2019 WL 1290883 (S.D. Ga. Mar. 20, 2019) (surveying cases); *but see In Matter of Application of U.S.*, 665 F. Supp. 2d 1210, 1223 (D. Or. 2009) ("It is clear that notice is an essential part of the reasonableness calculus in judging searches and seizures under the Fourth Amendment.").

And yet, there can be no doubt that for a warrantless covert search to be "reasonable," *someone* outside of law enforcement has to get contemporaneous notice of it. *See Dalia v. United States*, 441 U.S. 238, 247-4899 S. Ct. 1682, 60 L. Ed. 2d 177 (1979) (discussing what constitutes

---

[11] Indeed, if, as the government claims, SA Fife had already drafted a warrant application, there would have been even less "delay" in seeking a warrant to worry about. SA Fife seems to have recognized the lack of any colorable claim of "exigency" in choosing to mischaracterize the warrantless covert entry and search in his subsequent Report of Investigation as a "community caretaking" exercise (which, as discussed above, it was not).

"constitutionally adequate" substitute for advance notice of a search); *In Matter of Application of U.S*, 665 F. Supp. 2d at 1223 ("[W]hen there is no advance notice, a substitute must exist to satisfy the Fourth Amendment."). Otherwise, there would be no constraint on law enforcement engaging in warrantless covert searches of people's homes with impunity, and on law enforcement benefiting from information derived from such searches in criminal prosecutions without anyone – not the defendant, not a judge, and perhaps not even a prosecutor – being any the wiser.

Here, the delay in the government giving notice of the warrantless covert search at Defendant's home was two years and eleven months (not counting the additional delay caused by SA Fife's substantive misrepresentation of the search as a "community caretaking" exercise). That was not a "reasonable" amount of time to wait to tell *someone* outside of law enforcement that a warrantless covert search of Defendant's home had occurred. Accordingly, for that reason as well, the search was "unreasonable" and violated the Fourth Amendment.

## II.   CONCEALMENT AND MISREPRESENTATION OF THE WARRANTLESS COVERT SEARCH VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

The delay of at least two years and eleven months in giving notice of the July 8, 2015 warrantless covert search, and SA Fife's deliberate misrepresentations in his written account of it, also materially and irreparably impaired Defendant's opportunity to conduct a meaningful inquiry about the facts and circumstances of the search, and thus to mount a defense, in violation of Defendant's rights to procedural and substantive due process under the Fifth and Fourteenth Amendments.

**A.      Searches of Homes Impact Liberty, Property, and Privacy Interests.**

The Fifth Amendment, extended to the states by the Fourteenth Amendment, states that "[n]o person shall be … deprived of life, liberty, or property without due process of law." U.S. Const. amends. V, XIV.

Any government search of a home deprives the home's occupant of rights to liberty, property, and privacy, and thus implicates the home occupant's right to due process. *See Boyd v. U.S.*, 116 U.S. 616, 630, 6 S. Ct. 524, 29 L. Ed. 746 (1886) ("The principles laid down in this opinion […] apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property") (*cited with approval in U.S. v. Wurie*, 728 F.3d 1, 3 (1st Cir. 2013)).

Ordinarily, the requirement of due process for those deprivations is met through compliance with procedures satisfying the Fourth Amendment's warrant and reasonableness requirements.  *See generally Mapp v. Ohio*, 367 U.S. 643, 646-47 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (noting Fourth and Fifth Amendments run "almost into each other") (*citing Boyd,* 116 U.S. at 630).

**B.      Covert Searches Require Heightened Due Process Protections.**

A *covert* search impacts fundamental rights to an even greater degree than one conducted with the home occupant's contemporaneous knowledge. "[S]urreptitious searches and seizures of intangibles strike at the very heart of the interests protected by the Fourth Amendment. The mere thought of strangers walking through and visually examining the center of our privacy interest, our home, arouses our passion for freedom as does nothing else. That passion, the true source of the Fourth Amendment, demands that surreptitious entries be closely circumscribed." *U.S. v. Freitas*,

800 F.2d 1451, 1456 (9th Cir. 1986) *see also Nates*, 831 F.2d at 865 (Kozinski, J., dissenting) ("Clandestine searches are, by and large, foreign to our way of thinking because of their inherent intrusiveness, the heightened risk of abuse they pose, and because they are inconsistent with principles of openness and fair play we normally expect of our public officials.").

That is why federal search and seizure law, informed by constitutional principles, requires heightened judicial oversight of covert law enforcement activities directed at people's homes and other private spaces to ensure the person whose rights they impact receives timely, meaningful notice. *See Nates*, 831 F.2d at 865 (discussing laws requiring judicial oversight and adequate notice of covert investigative actions, which "fairly reflect our collective discomfort with surreptitious governmental intrusions into our privacy"). Judicial oversight becomes even more important when law enforcement wants to delay giving notice of an intrusion into a home, as reflected by federal law requiring the government to show a court "reasonable cause" to delay giving notice of a covert entry and search of a person's home or other private space (also known as a "sneak and peek"). *See* 18 U.S.C. §3103a. If the court agrees reasonable cause exists after the government makes its showing, then the statute authorizes a "reasonable" delay in giving notice of up to a *maximum* of 30 days. If the government wants to delay notice further, then it must return to court and make additional "good cause" showings to justify further delay.[12] *Id.*

The provisions of 18 U.S.C. §3103a essentially enshrine in federal statute a body of court-made law requiring, on constitutional grounds, close judicial oversight and prompt disclosure of any surreptitious entry and search of a premises by law enforcement. *See Freitas*, 800 F.2d at 1456

---

[12] §3103a also requires the issuing court to report to the Administrative Office of the United States Courts ("AOUSC") on its issuance of a delayed-notice warrant and the period of delay. The AOUSC must in turn report annually to Congress about all such warrants. Engaging in warrantless covert searches and keeping them secret from a court subverts this statutory mandate.

("While it is clear that the Fourth Amendment does not prohibit all surreptitious entries, it is also clear that the absence of any notice requirement in the warrant casts strong doubt on its constitutional adequacy.") (internal citations omitted); *U.S. v. Villegas*, 899 F.2d 1324, 1336-38 (2d Cir. 1990) ("[W]hen the authorized entry is to be covert and no tangible property is to be seized, there must be some safeguard to minimize the possibility that the officers will exceed the bounds of propriety without detection.").[13]

### C.     For *Warrantless* Covert Searches, Due Process Requires Even Stricter Measures to Ensure Timely, Meaningful Notice and an Opportunity to be Heard.

In the extraordinarily rare (one hopes) circumstance of a *warrantless* covert search of a home or other protected private space, however, no notice or oversight precedes or accompanies the deprivation of fundamental rights. Neither the home occupant nor the court has any idea a search has occurred unless law enforcement informs them.

"Because secret searches are so unusual in our national experience, there is little law on the subject" of what due process is due for these *warrantless* covert searches into a person's home. *Nates*, 831 F.2d at 865 (Kozinski, J. dissenting); *see also* Toomey and Kaufman, 54:4 Santa Clara L. Rev. at 847 (observing how rare it has been in the nation's history for physical searches of homes to go contemporaneously unnoticed).[14] Yet, federal law requiring timely and meaningful notice of covert searches *with* a warrant leaves no doubt that in order to ensure due process after a

---

[13] In *Freitas* and *Villegas*, the courts deemed a 7-day maximum delay in giving notice "reasonable." For a general history of the law of "sneak and peek" searches, *see* Jonathan Witmer-Rich, *The Rapid Rise of Delayed Notice Searches, and the Fourth Amendment Rule Requiring Notice*, 41 PEPP. L. REV. 509, 519-31 (2014), *available at http://digitalcommons.pepperdine.edu/plr/vol41/iss3/2*.

[14] Then again, perhaps the dearth of case law merely reflects that law enforcement usually succeeds in keeping secret searches a secret.

*warrantless* covert search of a home, the home occupant must, at a minimum, receive notice that is no less timely and meaningful. Likewise, in cases in which law enforcement wants to delay notice of a *warrantless* covert search, due process *at a bare minimum* requires a court to stand temporarily in the home occupant's stead to assess whether "reasonable cause" exists for the initial delay, and whether "good cause" exists for subsequent delay.

In other words, even when law enforcement conducts a *warrantless* covert search of a home, the Constitution requires it to report its activities to the home occupant and/or a court in a timely, meaningful manner. Otherwise, law enforcement would have a free hand to engage in and remain unaccountable for arbitrary, undisclosed, secret home searches. *See generally, Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government"); *McDonald v. United States*, 335 U.S. 451, 456, 69 S. Ct. 191, 93 L. Ed. 153 (1948) ("Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home."); James Otis, *Against Writs of Assistance* (February 1761) *available at https://www.constitution.org/bor/otis_against_writs.htm* (objecting to the writ of assistance as "a power that places the liberty of every man in the hands of every petty officer", allowing that officer to be "accountable to no person for his doings").[15]

Finally, it bears emphasizing that due process protections take on the highest degree of significance when the home occupant subject to a *warrantless* covert search is (or will be) the defendant in a criminal prosecution, since the facts and circumstances of the search will necessarily

---

[15] Even the infamous "writs of assistance" only permitted "petty officers" to enter premises in "daylight." *Id.*

bear upon the admissibility of evidence against him. *See generally* Toomey and Kaufman, 54:4 SANTA CLARA L. REV. at 860 (2015) ("One fundamental characteristic of our criminal system is the defendant's right to test whether the government's evidence was lawfully obtained, and to seek suppression of any evidence that fails that test. However, unless a defendant knows the source of the government's evidence – that is, unless he has notice – any such challenge is impossible.").

      **D.**     **SA Fife's Actions Deprived Defendant of Due Process.**

     Here, SA Fife subjected Defendant to a warrantless covert search of his home, depriving Defendant of liberty, property, and privacy interests. But Defendant did not receive constitutionally-adequate due process in connection with that deprivation. Neither Defendant nor a court received contemporaneous timely, meaningful notice of the search, nor did any court authorize or oversee the two-year, eleven-month delay in disclosing it, or the misleading content of the eventual disclosure. To the contrary, SA Fife went out of his way to keep the search under wraps contemporaneously and long after.

     Thus, the two-year, eleven-month initial delay in disclosing the July 8, 2015 warrantless covert search, made even longer by SA Fife's efforts to conceal and mischaracterize it, violated Defendant's rights to procedural and substantive due process of law guaranteed under the Fifth and Fourteenth Amendments.

            1.   *SA Fife violated Defendant's right to procedural due process by avoiding judicial oversight and by preventing Defendant from having timely, meaningful notice and an opportunity to be heard regarding the July 8, 2015 warrantless covert entry and search.*

     "For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Hamdi*

*v. Rumsfeld*, 542 U.S. 507, 533 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) (internal citations omitted); *see also Lambert v. California*, 355 U.S. 225, 228 (1957) ("Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges.").

SA Fife had a well-and-long-established legal obligation to either disclose the warrantless covert entry and search to Defendant immediately, or, if he wanted to keep it secret from Defendant for at least two years and eleven months, to make one "reasonable cause" showing and at least one (and likely *twelve*) subsequent "good cause" showings to the court. *See* Fed. R. Crim. P. 41; 18 U.S.C. §3103a.[16] His failure to do so violated Defendant's procedural due process rights in at least two ways.

*First*, if notice of the July 8, 2015 warrantless covert search was to be delayed, then *at a minimum* a court should have overseen when and how law enforcement would eventually give Defendant that notice in a manner that ensured a timely, meaningful opportunity to be heard. Even if a court had approved a delay of two years and eleven months (which seems exceedingly unlikely[17]), at the very least a judge would have had the opportunity to examine SA Fife's actions and his purported justifications for needing to keep them secret from Defendant. *See* 18 U.S.C. §3103a(b). That oversight by a judge would have itself been a form of notice and an opportunity

---

[16] Under §3103a, the first reasonable cause showing would have authorized a maximum delay in giving notice of 30 days. Each additional delay of up to a maximum of 90 days (except in special circumstances warranting a longer period) would require a good cause showing. There were 1,064 days between July 8, 2015 and June 6, 2018. Thus, after the first reasonable cause showing, SA Fife would have had to return to the court at least twelve additional times to authorize additional 90-day extensions to cover the entire remaining 1,034 days.

[17] The average delay in giving notice of "sneak and peek" warrants in the District of Maine in 2015 was 52 days, or 1,012 fewer days than the delay here. *See infra* n. 25.

to be heard that redounded to Defendant's (and the public's) benefit, even without Defendant's contemporaneous participation in it. *C.f.  McDonald*, 335 U.S. at 455-56 (placing "a magistrate between the citizen and the police ... was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime...").

*Second*, to be "timely and meaningful," Defendant's notice and opportunity to be heard about the July 8, 2015 warrantless covert entry and search had to happen while memories were still sufficiently fresh and evidence was still sufficiently available for Defendant to have a full and fair opportunity to investigate and litigate, among other issues, the constitutional validity of the search and its significance to the admissibility of evidence against him. *C.f. Doggett v. U.S.*, 505 U.S. 647, 654, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) (In the Speedy Trial context, the "possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence" is the most significant form of prejudice resulting from delay "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.").

The 1,064-day delay in notifying Defendant of the warrantless entry and search of his home (lengthened even further by the misleading nature of SA Fife's report, discussed below) was neither "timely" nor "meaningful." Defendant has tried to investigate the facts and circumstances of the July 8, 2015 warrantless covert search, but it is too late. Only one of the police personnel involved in the call to Defendant's home on July 8, 2015, Officer Murphy, remembers anything whatsoever about it. The other three – Officer Demchak, Lt. Ridge, and Mr. Dell'Aquila – denied any recollection, even after having been shown the CAD record they each had a hand in creating. Officer Murphy, moreover, did not remember entering and searching Defendant's home, or communicating information about the search to SA Fife, after reviewing the CAD record and being

36

told of SA Fife's account (the substance of which appeared to surprise him). Instead, the only salient fact Officer Murphy recalled was that the "fed" told him the subject matter of the criminal investigation that brought him there that night – a detail omitted from SA Fife's account that also undermines SA Fife's false assertion that he called the officers to Defendant's home for non-investigative, "community caretaking" purposes.

The police personnel's apparently sincere and truthful lack of recall, even after reviewing the CAD record and, in Officer Murphy's and Lt. Ridge's case, hearing about SA Fife's written account, impairs Defendant's opportunity to be heard especially acutely here because the police left no contemporaneous written record of entering and searching Defendant's home without a warrant or of giving information to SA Fife. Their absence is significant. The Portland Police Department had clear policies directing officers to write reports of "actions" taken during calls for service and to use the CAD system's "call disposition" and "narrative" features to keep thorough records even in non-action-taking situations.

The absence of contemporaneous records of Officers Murphy and Demchak having taken actions as significant as entering and searching a private home at night without a warrant at the behest of a federal agent who was conducting a criminal investigation there, and then telling that agent about the house's contents, thus casts serious doubt on the accuracy and candor of SA Fife's account of the events of July 8, 2015. One explanation for the absence of any such record is that the officers did not, in fact, enter and search the home without a warrant, and did not tell SA Fife what they saw inside; in other words, that SA Fife's account is fiction. Another is that through their interactions with SA, the officers were influenced not to follow record-keeping protocol.

Or, perhaps there are more innocent explanations. But therein lies the rub. Because of SA Fife's concealment of the warrantless covert search before, during, and after-the-fact, there is no

way to conduct a timely, meaningful test his assertions about what he and the officers did, saw, and heard that evening, or about what he purportedly learned about the contents of Defendant's home and his possessions. Nor is there any way, at this point, to explore adequately *why* there are no contemporaneous police records corroborating (or contradicting) SA Fife's account.

Simply put, SA Fife's actions deprived Defendant, the court, and even the government, of a timely and meaningful opportunity to explore what happened on July 8, 2015, and the significance of those events to the admissibility of evidence against Defendant. *See Doggett*, 505 U.S. at 655-56 ("excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify"). The permanent loss of a timely, meaningful opportunity to investigate and litigate SA Fife's account, which directly results from the inevitable, predictable effects of excessively-delayed notice of the search, is precisely the sort of constitutional harm that the right to procedural due process exists to prevent.

> 2. *SA Fife deprived Defendant of substantive due process by engaging in, avoiding oversight of, delaying notice of, and misrepresenting the July 8, 2015 warrantless covert entry and search.*

Additionally, what little contemporaneous evidence exists of the July 8, 2015 warrantless covert search of Defendant's home supports the troubling conclusion that SA Fife not only engineered and oversaw an egregious violation of Defendant's Fourth Amendment rights, but also took purposeful steps to keep that violation secret beforehand, while it was happening, and afterward, including by creating misleading evidence, which is a textbook example of a violation of substantive due process. *See generally Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence").

There is no need to beat a dead horse about the warrantless covert entry and search itself. A federal agent engineering a pretextual, warrantless, covert entry and search of a home under

cover of darkness in the course of a criminal investigation, by recruiting local police officers to conduct the search on his behalf, constitutes egregious conduct by any reasonable measure. *C.f. State v. Cada*, 923 P.2d 469, 478, 129 Idaho 224 (Ct. App. 1996). ("The clandestine [warrantless] intrusion [by agents into a home's curtilage] under cover of darkness in the dead of night exceeded the scope of any implied invitation to ordinary visitors and was not conduct to be expected of a reasonably respectful citizen").

But those are not the only objectionable actions SA Fife took. He also took steps on July 8 and afterward to conceal and mischaracterize events in a manner seemingly intended to deceive local law enforcement, his government colleagues, Defendant, and the courts. Specifically, SA Fife:

- Observed Defendant's home in its supposedly "unsecured" state in broad daylight at 6:45 p.m. while accompanied by a colleague, but only raised a purported "concern" about the home to the Portland Police Department when he returned to Defendant's home three hours later, alone, after dark.

- Called-in the Portland Police Department to search Defendant's home via a back channel that ensured there would be no recording or dispatcher's transcript of his call.

- Omitted, from his contemporaneous written report, any mention of contacting the Portland Police Department through this back-channel (and doubled-down on that misrepresentation as recently as June 28, 2019), giving the false impression that he called the Police Department through channels that would be used by an ordinary citizen, and that the Police Department responded as they would in the ordinary course.

- Did not take any action to determine Defendant's or his children's whereabouts that evening, such as by questioning neighbors or by contacting Defendant or Defendant's ex-wife (or having the police do so), despite possessing their contact information.

- Informed at least one of the responding police officers about the nature of his criminal investigation of Defendant – information that would have been irrelevant for police officers acting in a "community caretaking" role.

- Omitted, from his contemporaneous written report, that he had given this information to the officers.

- Repeatedly mischaracterized, in his report, Defendant's front door as being "wide open" in a manner suggesting the home was open to the street, while failing to specify that the home had a substantial, brand-new, locking storm door that was closed.

- Mischaracterized, in his report, the sight of open, screened-in windows and an open door behind a screened-in, locking storm door as something "suspicious" on a warm summer night in a residential neighborhood in Portland, Maine, when it is in fact a common summertime sight here and throughout Northern New England.

- Mischaracterized, in his report, the officers as having come to 107 Craigie Street "to conduct a welfare check due to the unsecured nature of the home," when in fact the officers had been dispatched by a senior command officer with specific instructions to enter the home without a warrant as requested by "Homeland Security."

- Mischaracterized, in his report, the police officers as being at Defendant's home for just a few minutes, whereas comparing his account of when the officers arrived at 107 Craigie Street (10:30 p.m.) with the CAD record of when they made themselves "available" for their next dispatch (10:48 p.m) appears to show the officers had to have been on-scene for *at least* 18 minutes in SA Fife's version of events.[18]

---

[18] In notable contrast, the officers' dispatch log reflects that they spent just moments at Defendant's home and had "negative contact" with anyone – yet another troubling discrepancy.

Were the shoe on the other foot, prosecutors would no doubt point to SA Fife's efforts to first hide his actions, and then depict them in the light most favorable to himself, as evidence of consciousness of the wrongfulness of his conduct. For purposes of this Motion, they constitute compelling evidence of a violation of substantive due process.

### III.      THE COURT SHOULD THEREFORE DISMISS THE INDICTMENT.

The constitutional violations committed by SA Fife call for a powerful remedy – dismissal of the indictment – for the following reasons.

### A.      SA Fife Knew or Should Have Known His Conduct Was Wrongful.

SA Fife crossed multiple, bright constitutional lines in engineering, overseeing, concealing, and mischaracterizing the warrantless covert entry and search of Defendant's home on July 8, 2015. The search itself fell well outside the "heartland" of the "community caretaking" and/or the exigent circumstances exceptions, constituting a clear violation of the Fourth Amendment. *Matalon*, 806 F.3d at 634-35. It was also unreasonable for lack of notice, which is a separate Fourth Amendment violation. Failing to give contemporaneous notice, avoiding judicial oversight, delaying disclosure by years, and authoring a purposefully (and successfully) misleading report, breached Defendant's due process rights under the Fifth and Fourteenth Amendments.

These were not close calls. It is well-nigh inconceivable that SA Fife did not recognize his actions were wrongful, considering how clear the lines he crossed were and how his conduct in crossing them reflected a consciousness of wrongdoing. But, if he really did not realize what he was doing was wrong, then he indisputably should have.

### B.      SA Fife Knew or Should Have Known Warrantless Covert Entries Require Scrutiny in Criminal Proceedings.

SA Fife also must have known that a timely, meaningful evaluation of the facts and circumstances of the July 8, 2015 warrantless covert entry and search would be unavoidably central

in any prosecution of Defendant. How could it not? An illegal, warrantless covert search that precedes by just a few days a search under a warrant necessarily bears on the admissibility of the fruits of the later search. *See Murray v. United States*, 487 U.S. 533, 537-38, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (discussing application of the exclusionary rule in just this sort of situation); *see also infra* Section IV. From the moment he called-in a warrantless covert entry and search of Defendant's home on July 8, 2015, SA Fife could not possibly have ignored the fact that his actions that night would have to come under scrutiny if Defendant were to be prosecuted. After all, at a minimum, SA Fife's July 9, 2015 Report of Investigation, which is demonstrably misleading in characterizing certain material facts favorably for SA Fife, still essentially constitutes an admission that he walked into Defendant's home on July 14, 2015, six days after the warrantless covert, illegal search, expecting to find the laptop computer the police officers had told him about (which was, it bears repeating, one of only two electronic storage devices SA Fife seized, and the only one that the government still retains as evidence in this case).

### C.   SA Fife Knew or Should Have Known Concealment and Misrepresentation Would Impair Scrutiny of the Warrantless Covert Search.

Finally, SA Fife must have known that his actions would impair Defendant's and the court's ability to engage in timely, meaningful scrutiny of what happened on July 8, 2015 and its significance to admissibility of evidence. Again, how could they not? The prejudicial effects of the passage of time on a defendant's ability to mount a defense are recognized in decades of case law, not to mention they are common sense. SA Fife was, and still is, a seasoned federal agent. He understands how time erodes memories and obscures important facts. He has no doubt received hours of on-the-job training in the importance of gathering evidence while it is fresh. No doubt he has also been trained in the purposes of requiring timely, meaningful, and accurate disclosure of law enforcement actions, so as to safeguard a criminal defendant's inalienable right to due process.

And yet, he took actions that undermined that scrutiny, and Defendant's due process rights, at every turn.

### D. SA Fife's Purported Preparation of a Warrant Application Does Not Excuse His Misconduct; It Only Heightens the Need for the Scrutiny He Prevented From Happening.

The government has indicated to Defendant its intention to argue that SA Fife had purportedly "completed" preparation of a warrant application just hours before engineering and overseeing the warrantless covert search of Defendant's home. The suggestion, it seems, is that having done the administrative legwork of preparing a warrant application based on information he had already acquired, SA Fife could not have taken any subsequent actions that were of consequence to his intention to apply for a search warrant (which he only did five days later). Or, put another way, the government seems to suggest that once SA Fife purportedly formed an intention to seek judicial permission to enter and search Defendant's home "legally" at some point in the future, any action he took thereafter that called his intentions and motivations into question would be moot.

But, of course, it is not possible to draw brackets around SA Fife's conduct so as to treat his actions between July 8 and July 15 as unrelated to his actions before then. Having a purported plan to follow the law of search warrants as of 5:00 p.m. on July 8 did not give SA Fife a free-pass to violate it a few hours later, and it certainly did not make his decision to engineer and oversee a warrantless covert search irrelevant to the admissibility of evidence here. SA Fife was both the sole investigative agent who could purport to possess the personal knowledge to swear out the search warrant affidavit, and the sole decision-maker in calling-in a warrantless covert search of Defendant's home. If anything, his illegal actions just hours after purportedly "completing" a draft warrant application call for even greater scrutiny, because they necessarily reflect on his state of

mind, motivations, and credibility vis-à-vis seeking a warrant. But here, SA Fife prevented that scrutiny from occurring.

E.      **Analogous Case Law Supports Dismissal as a Sanction for SA Fife's Constitutional Violations.**

Defendant has scoured the case law to find precedent for how courts have addressed constellations of constitutional violations similar to those committed by SA Fife here, but has yet to locate a case with a closely-similar fact pattern. This is, perhaps, unsurprising given how vanishingly rare it is (or, at least, should be) for law enforcement to conduct a warrantless covert search under cover of night that it then keeps secret for years. *See* Toomey and Kaufman, 54:4 SANTA CLARA L. REV. at 847.

In the absence of direct precedent, analogous case law may help the Court sift the issues. Defendant respectfully submits that the following lines of cases can aid the Court's analysis, and that in the aggregate, they support the conclusion that dismissal of the indictment is the only appropriate remedy for the harm done by SA Fife's actions: a deprivation of Defendant's timely and meaningful opportunity to investigate and litigate the facts and circumstances of a search of his home that bears on the admissibility of evidence against him.

1.      *"Pre-indictment Delay" Case Law Supports Dismissal as a Sanction.*

Though it examines prosecutorial actions that are far more discretionary than those taken by SA Fife here, First Circuit case law examining "pre-indictment delay" can shed light on how the consequences of certain government conduct can rise to the level of a due process violation requiring dismissal of an indictment.

Specifically, the First Circuit's "pre-indictment delay" cases establish that delay in charging a defendant constitutes grounds for dismissal of an indictment where the delay causes prejudice to the defense and is motivated by the prosecution's desire to gain a tactical advantage

in the proceedings. *See U.S. v. Irizarry-Colon*, 848 F.3d 61, 70-71 (1st Cir. 2017); *U.S. v. Bater*, 594 F.3d 51, 54 (1st Cir. 2010).[19] That case law also establishes that even without wrongful intent on the part of the government, a violation of due process can result from delays "incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *U.S. v. Ramos-González*, 775 F.3d 483, 491 (1st Cir. 2015) (quoting *United States v. Lovasco*, 431 U.S. 783, 795 n. 17, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)). Also, while the "pre-indictment delay" case law holds that vague or speculative allegations about how delay might have resulted in "faded memories" or "lost evidence" may not establish prejudice to the defendant sufficient to support dismissal, specific facts showing that the passage of time materially impaired the defense by effectively depriving the defendant of witnesses and evidence might. *Bater*, 594 F.3d at 54.

Of course, analogizing SA Fife's actions to excessive pre-indictment delay has its limits. Courts limit due process considerations to egregious cases of pre-indictment delay because prosecutors are usually vested with broad discretion to decide when and how to bring charges. *Id.*; *Irizarry-Colon*, 848 F.3d at 71. In stark contrast, SA Fife had a narrow, well-delineated set of potential excuses (none of which applied) for engineering and overseeing a secret, warrantless search of Defendant's home under cover of night, and had no discretion whatsoever in deciding whether to disclose that search to a court and Defendant in a timely and meaningful manner. So, whereas due process comes into play only in the rare cases of "deliberate misconduct by the prosecutor (or at least something very close to that)" in the exercise of prosecutorial pre-indictment

---

[19] For an overview of "pre-indictment delay" case law nationwide, see Eli DuBosar, *Pre-Accusation Delay: An Issue Ripe for Adjudication by the United States Supreme Court*, 40 FLA. ST. U. L. REV. 659 (2013), *available at* http://ir.law.fsu.edu/lr/vol40/iss3/5.

discretion, *Bater*, 594 F.3d at 54, it plays a central and essential role in deterring government agents from stepping outside of clear constitutional bounds over which they have virtually no discretion, such as when they engage in, delay notice of, and deliberately conceal, warrantless covert intrusions into Americans' homes.

### 2.   Speedy Trial Clause Case Law Supports Dismissal as a Sanction.

Another body of case law touching on considerations relevant to the Court's analysis here concerns violations of the Sixth Amendment's guarantee of a speedy trial. U.S. Const. amndmt. VI. The Speedy Trial Clause "recognizes a general concern that all accused persons be treated according to decent and fair procedures, a societal interest in providing a speedy trial, and the risk that pretrial delay might result in witness unavailability and fading memories, which may prejudice both defendants and prosecutors." *U.S. v. Handa*, 892 F.3d 95, 101 (1st Cir. 2018) (citing *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)). Although the constitutional right to a speedy trial attaches only upon arrest or indictment, how courts assess whether a delay is sufficiently prejudicial to warrant dismissal of an indictment can inform this Court about the damage done to Defendant by the excessive passage of time after the warrantless covert search here.

"The Sixth Amendment Speedy Trial Clause protects the accused against a number of harms associated with a delay between accusation and trial, including oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired' by dimming memories and loss of exculpatory evidence." *Handa*, 892 F.3d at 105 (citing *Doggett*, 505 U.S. at 654). "Of these harms, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* In the Sixth Amendment speedy trial context, a delay between accusation and trial of just *one year*

46

is deemed "presumptively prejudicial" and "the presumption that delay prejudices the defendant intensifies over time." *Id.* at 102.

There is no reason to think the passage of time, in and of itself, causes any less fading of memories or impairment of evidence in the pre-indictment context than in the post-indictment one. Rather, the distinction between the "pre-indictment delay" case law and the Speedy Trial Clause case law is, in essence, a distinction between government inaction and government action. Whereas a due process violation occurs in "pre-indictment delay" cases only when the government *fails* to act for wrongful and prejudicial purposes, delay violates the Speedy Trial Clause when the government takes action to deprive the defendant of fundamental rights without affording him a timely and meaningful opportunity to attempt to vindicate those rights at trial. Government action that affirmatively impairs a person's rights, in other words, amplifies the constitutional harm caused by delay.

Here, SA Fife took a specific action – the warrantless covert search – that directly impaired Defendant's rights. By analogy, the delay that followed SA Fife's action is analytically similar to the delay between the filing of a sealed indictment (which triggers the Sixth Amendment speedy trial right in this Circuit) and trial. *See, e.g.*, *U.S. v. Casas*, 356 F.3d 104 (1st Cir. 2004) (measuring delay from filing of sealed indictment). Like a prosecutor filing an indictment, SA Fife knew the actions he took on July 8, 2015 would require timely, meaningful scrutiny in an adversarial proceeding akin to a trial, and that he must subject them to timely, meaningful judicial oversight (particularly if notice of them was to be delayed).

If a hearing was to be held on this Motion, however, it would take place more than four years after the government action that triggered Defendant's constitutional right to be heard on it in a timely, meaningful manner. The "reliability" of that hearing would be "compromise[d]" by

the "excessive delay" SA Fife caused to no less of a degree than a trial begun four years after the filing of an indictment. *See Doggett*, 505 U.S. at 655-56 ("excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify").

### F.      The Court Should Therefore Dismiss the Indictment.

SA Fife's violations here constitute something of a hybrid of the pre-indictment and post-indictment violations discussed above. On one hand, they occurred before Defendant was charged, which would suggest the Court should give particular attention to the knowing wrongfulness of SA Fife's actions in determining the appropriate remedy for them; on the other hand, they deprived Defendant of fundamental rights to liberty, property, and privacy the moment they occurred, which suggests the Court should place emphasis on how the length of the delay in their disclosure in-and-of-itself harmed Defendant's ability to vindicate those rights and to assess the impact of SA Fife's actions on the admissibility of evidence.

Defendant respectfully submits that wherever the Court might locate its analysis on the continuum between the pre-indictment and post-indictment delay case law, the facts support dismissal of the indictment. SA Fife engineered, oversaw, concealed, and mischaracterized the July 8, 2015 warrantless covert entry and search of Defendant's home in the face of clear constitutional and legal requirements that he do otherwise. He knew at the time his actions were wrongful, that they would become central to the analysis of the admissibility of evidence seized in a later search, and that he would make it more difficult for that analysis to occur by delaying disclosure and misrepresenting the facts in his reporting. SA Fife's actions thus impaired Defendant's ability to mount an effective defense by preventing Defendant (and this Court) from timely and meaningfully investigating and litigating facts that would be critically relevant to the admissibility of evidence seized under the July 13, 2015 warrant.

Defendant acknowledges dismissal of an indictment is an extraordinary and rare sanction. But he respectfully submits the facts above show this is one of those unusual cases in which dismissal is not just an appropriate remedy for the particulars of the case, but is also more broadly necessary to safeguard fundamental rights against the creeping danger of arbitrary government action.

The United States of America was, quite literally, born out of our forefathers' insistence that "petty officers" must never have the power to invade the sanctity of a person's home with impunity. *See Carpenter,* 138 S. Ct. at 2213-14; James Otis, *Against Writs of Assistance*, *supra* at Section II(C). SA Fife's actions demonstrate the evident, if unfortunate, need for this Court to send the strongest possible message to law enforcement in the District of Maine and elsewhere to remind them of that fundamental principle: it is *never* acceptable in this country for law enforcement to engage in a warrantless covert home entry and search and then to remain unaccountable for it at will by concealing its facts and circumstances from defendants, the courts, and the public. Dismissal of the indictment will send that message loud and clear.

## IV.   ALTERNATIVELY, THE COURT SHOULD SUPPRESS THE FRUITS OF THE JULY 13 SEARCH WARRANT.

Under the well-known "exclusionary rule," evidence obtained directly or indirectly from an illegal search must be suppressed. *U.S. v. Siciliano*, 578 F.3d 61, 68 ("[T]he exclusionary rule prohibits the introduction of tangible and testimonial evidence that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint.") (internal citations omitted).

As an alternative to dismissal of the indictment, this Court should apply the exclusionary rule to suppress the fruits of the July 13, 2015 search warrant. Because SA Fife's violation of

Defendant's rights to due process prevented timely, meaningful investigation and litigation of the facts and circumstances of the July 8, 2015 warrantless covert entry and search, and further, in light of what the Court can safely surmise from the contradictory and misleading accounts that do exist of what happened that evening, the government cannot meet its "onerous burden" of proving that "no information gained" from the illegal search "affected" SA Fife's decision to seek the July 13, 2015 warrant.

### A.    *Murray v. U.S.* Imposes an "Onerous Burden" on the Government to Show The Fruits of the July 13, 2015 Warrant Are Admissible.

There are several recognized exceptions to the exclusionary rule. *See generally, Utah v. Strieff*, 136 S. Ct. 2056, 579 U.S., 195 L. Ed. 2d 400 (2016). "Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence": the "independent source" doctrine[20], the "inevitable discovery" doctrine[21], and the "attenuation" doctrine.[22] *Id.* at 2061. Because it involves the fruits of a search conducted pursuant to a warrant days after an illegal search, this case implicates the "independent source" doctrine.

In *Murray v. U.S.,* Justice Scalia  summarized the "independent source" doctrine as the principle that when the government obtains evidence from an unlawful search, and then obtains the same or derivative evidence in a subsequent "lawful" search, the evidence obtained through

---

[20] "[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers [subsequently] independently acquired it from a separate, independent source." *Id.* at 2061.

[21] "[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Id.* This doctrine applies when there is no *actual*, subsequent, "lawful" discovery of the "tainted" evidence, but instead where the government can show there *would* have been. *Id.* at 2061.

[22] "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* at 2061.

the second, "lawful" search is subject to the exclusionary rule unless it comes into the government's possession in a manner free of the "taint" of the first illegal search. *Murray v. U.S.*, 487 U.S. 533, 537-38, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). Put another way, when an illegal, warrantless search precedes a "legal" one under a warrant, the fruits of the latter search are suppressed unless the government can "show that the agents' decision to seek the warrant was not influenced by what they saw" during the first, illegal, warrantless search. *U.S. v. Aiken*, 225 F. Supp. 3d 85, 102-03 (D. Me. 2016) (citing *U.S. v. Dessesaure*, 429 F.3d 359, 370 (1st Cir. 2005)). "It is the government's burden to establish, by a preponderance of the evidence, that the [later, "legal"] search was an independent source of the evidence" it yielded. *Siciliano*, 578 F.3d at 68.

This is no small burden for the government to meet. In *Murray*, the dissent worried that Justice Scalia's articulation of the independent source doctrine would incentivize law enforcement, once it possessed evidence it believed sufficient to obtain a warrant, to then "routinely enter [a premises] without a warrant to make sure that what they expect to be on the premises is in fact there," so as to avoid wasting time obtaining warrants for worthless searches. Justice Scalia and the majority disagreed, writing (in a passage that also happens to address the exact situation in this case):

> We see the incentives differently. An officer with probable cause sufficient to obtain a search warrant **would be foolish to enter the premises first in an unlawful manner**. **By doing so, he would risk suppression of all evidence on the premises, both seen and unseen**, since his action would add to the normal burden of convincing a magistrate that there is probable cause **the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it.**

*Murray,* 487 U.S. at 540 (emphasis supplied). In weighing whether the government can meet that "onerous" burden, the Court engages in a "**subjective inquiry** [that] turns on whether the **particular officer** would have still sought the warrant absent the unlawfully obtained information.

*U.S. v. Rose*, 802 F.3d 114, 123 (1st Cir. 2015) (emphasis supplied). In that inquiry, the Court is "not bound by after-the-fact assurances of [the officers' subjective] intent [to seek a warrant], but instead **must assess the totality of the attendant circumstances** to ascertain whether those assurances appear implausible." *Aiken*, 225 F.Supp.3d at 103 (suppressing evidence illegally obtained in light of totality of circumstances of illegal search) (*citing Dessesaure*, 429 F.3d at 370) (emphasis supplied).

### B.      Preparing a Draft Warrant Does Not Moot the *Murray* Analysis.

In many cases applying *Murray*, an investigative team consisting of multiple officers gathers evidence over a period of time, and the question for a court is whether a Fourth Amendment violation by one of them taints a later search stemming from their collective work. *See, e.g. Dessesaure*, 429 F.3d 361-65. In those cases, courts take care to ensure the investigative train fueled with the evidence collected by the many does not get derailed by the foolish actions of the few. *Id.* at 369-70.

Here, in notable contrast, just one federal agent – SA Fife – did the investigating; engineered, oversaw and concealed the illegal search; and possessed the requisite personal knowledge for swearing out the eventual search warrant affidavit. In other words, SA Fife alone conducted and stoked the engine of the investigative train. His choices, knowledge, and state of mind in steering the investigation into illegal territory on July 8, and in concealing afterward what he'd done, bear upon an analysis of his subjective intent to seek a warrant just as much as, if not more than, anything he purportedly said or did before that moment in time.

That is what Justice Scalia meant in describing as "onerous" the government's burden of proving an earlier illegal search does not "taint" the fruits of a later, "legal" one. *Murray,* 487 U.S. at 540. Preparing a draft search warrant application that may eventually get signed by an agent (and which consists, it must be said, of mostly cut-and-pasted boilerplate language) does not

insulate the government from scrutiny of that agent's subsequent conduct. If it did, then the government's *Murray* burden would hardly be an "onerous" one, and agents would, in effect, have free reign to ignore the Constitution once one of them could claim to have a draft in hand.[23] *Murray* rejects taking such a myopic view of law enforcement's subjective intent, especially in cases, such as this one, where a single agent does all of the (legal and illegal) investigating before swearing out an affidavit seeking a warrant.

### C.  As a Matter of Law, the Government Cannot Meet Its "Onerous Burden" Because SA Fife Deprived Defendant and the Court of a Timely, Meaningful Opportunity to Assess the July 8, 2015 Warrantless Covert Search.

Here, the government will likely contend that the July 8, 2015 warrantless covert entry and search was inconsequential to SA Fife's plans and subsequent actions, because he already intended to obtain a warrant. The government may even go so far as to argue that it does not matter what SA Fife and the police officers did on the evening of July 8; that SA Fife's purportedly pre-existing intent and preparations to seek a warrant as of the end of the business day on July 8, 2015 would render moot any and all evidence from that work-day, forward, that might bear upon an understanding of SA Fife's state of mind.

For the reasons set forth above, that position conflicts with *Murray*. Moreover, what little evidence exists of the events of July 8 calls the plausibility of SA Fife's purported assurances of his intentions into question, as discussed in section IV(D) below.

But, more fundamentally, one reason the government might feel confident in making such arguments is because SA Fife ensured the impossibility of Defendant or the Court testing them

---

[23] Given the relative simplicity of preparing an application comprising mostly cut-and-pasted language, treating a draft warrant application as dispositive proof of subjective intent would amount to little more than treating the alleged existence of probable cause as dispositive of that intent. *Murray* explicitly rejected that view.

against a meaningfully-complete, contemporaneous evidentiary record. Evidence illustrating SA Fife's "subjective intent" and the "totality of the circumstances" of the illegal search – what motivated it; who engaged in it; what specifically happened before, during, and after it; what specific information it yielded relevant to SA Fife's decision-making; and what it revealed about SA Fife's subjective intent – is unavailable because SA Fife deprived Defendant of the constitutionally-required due process of timely and meaningful notice and an opportunity to be heard. *Aiken*, 225 F.Supp.3d at 103. Of particular relevance, SA Fife's actions prevented Defendant and the Court from exploring what specific "information" SA Fife "gained" from the illegal search. *Murray,* 487 U.S. at 540.

The government must not gain an advantage from the evidentiary deficit SA Fife created. SA Fife deprived Defendant, the Court, and even the Assistant United States Attorney, of a timely and meaningful opportunity to assess his own subjective intent and the "totality of the circumstances" of the warrantless covert search he engineered and oversaw of Defendant's home. In the absence of that crucial evidence, the government cannot, as a matter of law, meet its "onerous burden" of proving that "no information gained" on July 8, 2015 affected SA Fife's decision to seek the July 13, 2015 warrant. The fruits of the July 13, 2015 search warrant must therefore be suppressed.

### D.   The Government Cannot Meet Its "Onerous Burden" as a Factual Matter, Either.

In any event, the sparse factual record that exists demonstrates that the government cannot meet its "onerous burden" of proving that what SA Fife learned from the warrantless entry on July 8, 2015 did not affect his decision to seek a warrant on July 13, 2015. Here's why.

### 1. *SA Fife had ample opportunity and ability to seek a warrant but did not.*

Unlike most cases applying *Murray*, the court here does not have to speculate about whether SA Fife still would have sought a search warrant if he had not engineered and overseen a warrantless covert search of Defendant's home on July 8, 2015. Instead, here the court has the benefit of looking at what SA Fife actually did, or more precisely, what he did not do, in the week leading up to July 8, and at the decisions it can safely assume he made that evening; namely, despite having ample opportunity and ability to apply for a warrant using the information he already possessed, SA Fife did not, in fact, apply for a search warrant before July 8, 2015, and he again opted not to do so that evening. *C.f. Aiken*, 225 F. Supp. 3d at 103 (fact that agents had not sought warrant for one motel room despite possessing specific evidence of drug sales from it belied claim they intended to apply for warrant to search adjacent motel room).

According to his own account, a week-or-so before the warrantless entry on July 8, 2015, SA Fife had already finished gathering the information he would later include in his application for the July 13 search warrant. The government contends SA Fife already had a "completed" draft of the warrant application in-hand by July 8 (although this account seems to conflict with the date of SA Fife's first investigative report).[24] But rather than executing an affidavit under oath and filing an application in the days leading up to July 8, SA Fife instead continued to surveil Defendant at home and at work. From this, we can safely infer SA Fife, an experienced agent,

---

[24] Specifically, SA Fife authored his Report of Investigation on July 9, 2015. It contains a detailed recitation of facts. SA Fife's July 13, 2015 search warrant affidavit contains a more generalized, less-detailed version of those same facts, with some phrasing matching the July 9 Report of Investigation word-for-word. It seems unlikely that SA Fife wrote the generalized version of those facts, dated July 13, before writing the detailed version dated July 9.

believed he needed to obtain some additional information, beyond what was ultimately contained in his search warrant application, *before* seeking a warrant.

SA Fife's actions on the evening of July 8, 2015 confirm and reinforce that inference. Presented with what he purportedly perceived to be "unsecured" premises at 6:45 p.m., SA Fife had at least two potential options for getting a warrant: He could have opted to "freeze" (i.e., prevent access to) Defendant's home while he sought a warrant to search it and seize evidence, *Siciliano*, 578 F.3d at 70-71; or he also could have sought immediate permission to conduct a covert search with delayed notice under 18 U.S.C. §3103a.[25] Whether a court would have approved such requests is, at this point, unknowable, but in any event, SA Fife chose neither of them (even though he purportedly had a "completed" warrant application in hand).

Instead, having had nearly four hours to think over his plan of action between 6:45 p.m. (when he reportedly first observed Defendant's home that evening)  and 10:30 p.m. (when the Portland police officers reportedly arrived at Defendant's home at his request), SA Fife took the extraordinary, and illegal, step of engineering a surreptitious, warrantless entry and search under the false pretense of a "welfare check."

In taking that drastic action in lieu of one that had at least the potential to be legally defensible, SA Fife revealed everything we need to know about his *subjective* state of mind and investigative intentions, as of July 8, 2015, vis-à-vis seeking a warrant. *Aiken*, 225 F. Supp. 3d at

---

[25] Maine's federal law enforcement community was well-acquainted with the option of obtaining a "sneak and peek" warrant. From October 1, 2014 through September 30, 2015, the government made 25 applications to the federal district court in Maine for such warrants, and had 24 of its requests approved. The government also made 19 requests for extensions of periods of delay, and had all 19 approved. The average period of delay in giving notice of a court-authorized covert search was 52 days. *See* REPORT OF THE DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS ON APPLICATIONS FOR DELAYED-NOTICE SEARCH WARRANTS AND EXTENSIONS 3 tbl. 1 (2015), *available at* https://www.uscourts.gov/sites/default/files/2015_directors_report_to_congress_0.pdf.

103 (assessing particular agents' subjective intent). No matter what he had planned up to that point, by as early as 6:45 p.m. that evening when he returned to Defendant's home for the fifth time in a week to surveil it, and definitely no later than 10:30 p.m. (when, according to SA Fife, police officers arrived on-scene in response to his back-channel request for a warrantless entry), SA Fife had apparently concluded he needed additional information – information that he could only obtain by looking inside Defendant's home – *before* he pulled the trigger on applying for a search warrant. It is, as yet, unclear what that information was. But it does not really matter. What matters is that SA Fife indisputably had the ability, opportunity, and resources to apply for a warrant before and on the night of July 8, *and yet he did not do so*, opting instead to take the extraordinary step of gathering additional information via an illegal search. SA Fife's decision not to apply for a warrant when he had the chance, and his decision to engineer, oversee, and conceal a warrantless covert search of Defendant's home instead, supports the conclusion that no matter what legwork he had done ahead of time, he would not have applied for the warrant without having obtained the information he gleaned from the warrantless covert search.

### 2.   *SA Fife opened a case file only after the warrantless search.*

Further confirmation of SA Fife's subjective intent not to obtain a search warrant until he had first obtained the information gleaned from the warrantless covert search appears on the face of SA Fife's own July 9, 2015 Report of Investigation. Despite having purportedly obtained electronic data and subscriber information about Defendant and having done multiple rounds of surveillance at Defendant's home and work in the days preceding July 8, 2015, and (according to the government) having "completed" a draft warrant application, SA Fife did not formally open a case file on Defendant until the day *after* the warrantless covert entry and search, July 9, 2015. What's more, from that date forward, it does not appear SA Fife did *any* further investigation of

Defendant until he applied for a warrant on July 13. This bolsters the conclusion that information SA Fife gleaned from the July 8 warrantless entry was pivotal to his decision to apply for a warrant.

### 3. Steps taken to conceal and mischaracterize the warrantless covert entry constitute evidence of consciousness of wrongfulness of actions.

As discussed above, in the face of constitutional and statutory obligations requiring him to do otherwise, and at great professional risk, SA Fife engineered and oversaw a warrantless covert search, delayed disclosing it for years, and mischaracterized it in an investigative report. These steps evidence consciousness of guilt. If the information gleaned from the July 8, 2015 warrantless covert entry was inconsequential to SA Fife's ultimate decision to apply for a warrant, then he would have had no reason to take such extreme measures.

This Court can safely infer from SA Fife's failure to seek a warrant before or on July 8, 2015, from his official opening of an investigation file only on July 9, 2015, and from the extraordinary and risky steps SA Fife took to conceal and mischaracterize his actions before, during, and long after the warrantless covert entry and search, that whatever he learned that evening had a material influence on his decision to apply for the July 13, 2015 warrant. The fruits of the July 13 warrant must therefore be suppressed under the exclusionary rule.

## CONCLUSION

The warrantless covert entry and search of Defendant's home on July 8, 2015 with long-delayed notice violated the Fourth Amendment. The lack of timely, meaningful notice and an opportunity to be heard on the warrantless covert entry and search violated of the Fifth and Fourteenth Amendments by impairing Defendant's ability to mount an effective defense. And the government cannot as a matter of law or fact meet its onerous burden of cleansing the July 13, 2015 search of the taint of the July 8, 2015 illegal search.

Accordingly, for the foregoing reasons, the Court should dismiss the indictment against Defendant with prejudice. Alternatively, the Court should suppress all fruits of the warrant issued on July 13, 2015.

Date:  July 8, 2019

s/Walter F. McKee
WALTER F. MCKEE
McKee Law, P.A.
133 State Street
Augusta, ME.   04330
(207) 620-8294

## CERTIFICATE OF SERVICE


       I hereby certify that on July 8, 2019 I electronically filed the Motion to Dismiss and/or Suppress with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:  United States Attorney's Office, Portland, Maine.

      Date:  July 8, 2019


                        s/Walter F. McKee
                        WALTER F. MCKEE
                        McKee Law, P.A.
                        133 State Street
                        Augusta, ME.   04330
                        (207) 620-8294