UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                  )<br>)<br>)<br>GEORGE ROYLE V                          ) | Case No. 2:18-cr-00165-JNL-1 |

## AFFIDAVIT OF GEORGE ROYLE V

I, George Royle V, hereby swear and affirm on penalty of perjury, and on information personally known to me, that the following is true and correct:

1. Between June 2014 and July 2018, I owned and lived in a single-family home at 107 Craigie Street in Portland, Maine.

2. The home was set back about fifty feet from Craigie Street.

3. The home had a back yard that was accessible from a door at the rear of the house or via a narrow walkway along the northerly side of the property through a chain-link fence gate that I kept closed.

4. At the time (and to this day), there was a street light across Craigie Street from the front of the house that illuminated the front yard in the evening.

5. At the time, there was also a powerful flood light affixed to a house adjoining the back yard of 107 Craigie Street, which illuminated the back yard of 107 Craigie Street in the evening. That light has since been removed.

6. Attached hereto as Exhibit 1 is a Google Earth satellite image, taken September 6, 2015 according to Google, with the locations of the chain link fence gate, front street light, and rear flood light indicated.



7. 107 Craigie Street is located in a quiet, residential neighborhood of single-family homes. It is not heavily trafficked. It is the kind of place where neighbors know and look out for one another, people take evening strolls, and neighborhood children bike in the street and play in each other's front and back yards.

8. I purchased the home in June 2014 in connection with getting divorced. I sold the home in July 2018.

9. The divorce was a matter of public record.

10. In the divorce, my ex-wife and I agreed to share equal custody of our two children.

11. In the divorce, my ex-wife stayed in and acquired full-ownership of our former marital home at 84 Caleb Street in Portland, Maine.

12. 84 Caleb Street and 107 Craigie Street are on adjoining parallel streets, just a few hundred yards apart as the crow flies.

13. I purchased the home at 107 Craigie Street so that my sons, who were (almost) two and six at the time of the divorce, would not feel too displaced by moving from one house to the other.

14. Attached hereto as Exhibit 2 is a Google Earth satellite image, taken September 6, 2015 according to Google, showing the neighborhood and the locations of the two homes.

15. On the morning of July 7, 2015, a workman from Loranger Window & Door installed a new storm door at 107 Craigie Street. Attached hereto as Exhibit 3 is an image of the cancelled check (with my account number redacted) that I handed to the workman upon completion of the installation that morning, and which was debited from my account the following day.

16. The new storm door, made by the door manufacturer Larson, was of high quality and far more substantial than some screen doors that seem flimsy. It had a plexiglass bottom pane, and a top pane of plexiglass that could slide down next to the lower pane, revealing a screen. It also had a deadbolt key-lock and a full handle.

17. The description of the door as it appeared on Larson's website when I purchased it can be seen at the internet archive website Archive.org: https://web.archive.org/web/20150704002212/http://www.larsondoors.com/storm_doors/quickfit_products/fullview. Advertised features of the door included a "BUILT-IN deadbolt security lock."

18. The current model of the door is advertised at this website: https://www.larsondoors.com/storm-doors/product-details?CG=140. The website currently advertises: "A deadbolt lock built right in to put your mind at ease. The lock features levers inside and out for a sleek, yet secure design."

19. My home at 107 Craigie Street did not have air conditioning. In the summer it tended to get very hot inside the home during the day. It was common for me to leave the screened-in windows open, and to open the interior front door of the home behind the screened-in storm door, so that air could circulate.

20. I purchased the new storm door, and made sure it was of high quality and could lock, so that it could serve as the "front door" of 107 Craigie Street in the summertime.

21. Having a sturdy, locking storm door was also important because of how the afternoon sun shined on the front of the house in the summertime. The front of the house faced due southwest. When the interior front door was left closed behind the storm door in full-sun, the glass portion of the door focused the sunlight to such a degree that the paint on the

interior door would bubble and the wood would crack. Having a securely-locking storm door helped solve that problem by making it possible to keep the interior door open and out of the direct sun.

22. Many of the homes in the neighborhood lacked air conditioning. Open screened-in windows, and open interior doors behind screened-in storm doors, are common sights in the neighborhood (and throughout Portland) in the summertime.

23. On July 8, 2015, my seven-year old son and I attended an evening Red Sox game in Boston, Massachusetts. My younger son stayed with his mother that evening at 84 Caleb Street.

24. We drove to the game with friends – two adults and their three children – in a minivan driven by one of the adults.

25. We left Portland around 3:00 p.m.

26. We stayed at the game until around 10:00 p.m.

27. My son and I arrived back at 107 Craigie Street shortly after midnight.

28. I have no specific memory of the state of my home when we returned that evening.

29. I am certain, however, that I did not know nor did I have any indication that police had entered and searched my home while my son and I were at the Red Sox game.

30. I did not receive contemporaneous notice, in any form, that police had entered and searched my home on July 8, 2015.

31. When Homeland Security Investigations Special Agent David Fife ("SA Fife") led the execution of a search warrant at my home on the early morning of July 14, 2015, he did not say anything to me about police having been inside my home, at his request and while he watched, on July 8, 2015. No one else at my home that morning said anything to me about an earlier search, either.

4

32. I did not learn police had entered and searched my home on July 8, 2015 until on or about June 6, 2018, when the Assistant United States Attorney sent SA Fife's July 9, 2015 Report of Investigation ("ROI") to my attorney.

33. When I first read the ROI, I credited SA Fife's account of the July 8, 2015 search as being a non-investigative "welfare check" conducted over the span of just a few minutes by police officers unaware of the nature of his investigation.

34. I did not discover the factual questions surrounding the ROI, nor their legal significance, until after I was indicted, when I hired a private investigator and former police detective, David Loranger, to provide assistance in this matter.

35. After reviewing the case file in January 2018, Mr. Loranger advised that it was important to investigate the facts and circumstances of events described in the ROI, and particularly to obtain records from the Portland Police Department that should exist documenting those events.

36. In furtherance of Mr. Loranger's investigation, and at his suggestion, I made several requests under the Maine Freedom of Access Act for information from the Portland Police Department. Records generated from those requests are attached to my accompanying motion.

July 8, 2019

George Royle V

Sworn to and subscribed before me this 8th day of July, 2019.

Notary Public Comm. exp. 2/7/2024