## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cr-00165-JNL-1 |
| | ) | **FILED UNDER SEAL** |
| | ) | |
| GEORGE ROYLE V | ) | |

## (REDACTED) SETENCING MEMORANDUM

Defendant George Royle V, by and through his undersigned counsel, respectfully submits this Sentencing Memorandum and attached exhibits in anticipation of his October 9, 2020 sentencing hearing. We hope they will (1) add valuable information to the PSR; and (2) assist the Court in determining pursuant to 18 U.S.C. §3553(a) that, in light of that information, a non-custodial sentence of probation or home-confinement (accompanied by the unavoidable stigma and legal consequence of mandatory sex offender registration) is a fair, just, and appropriate sentence.

### I.       PRELIMINARY STATEMENT

On January 23, 2020, a jury found Mr. Royle guilty of one count of knowing possession or accessing with intent to view child pornography, or attempt to do the same, in violation of 18 U.S.C. §§2252A(a)(5)(B), 2252A(b)(2), and 2256(8)(A). Mr. Royle testified at trial, and the Court has since determined that he supplied information from which the jury could have concluded that he was guilty. Mr. Royle's testimony focused largely on his years-long struggle with compulsive pornography use and how it brought him in contact with contraband, and on evidence suggesting that his computer may have additionally accessed such imagery on its own. Nothing in this Sentencing Memorandum should be taken as detracting from Mr. Royle's genuine and heartfelt

remorse for his compulsive pornography use, or from his recognition of the sole responsibility he bears for the harmful effects of his conduct.

We respectfully submit, however, that Mr. Royle's actions represent an aberration, borne of the disease of addiction. Mr. Royle is not a deviant. He is not a collector or promotor of illicit pornography. He has never harbored an intent to exploit or harm children. He represents neither a danger to his community nor a risk of recidivism. His actions may have violated the law, but he is the polar opposite of the kind of person at whom the law is aimed.

He is, instead, a good man, a loving father, and a deeply conscientious and moral citizen. He stands in judgment today because his life fell apart in the destructive spiral of an addiction that he did not want, and for which he has worked tirelessly to atone by committing himself to recovery and by helping others do the same.

As detailed below, for years before federal agents showed up at his door, Mr. Royle had repeatedly tried, and regrettably failed, to overcome his compulsive reliance on digital pornography use as a means of escaping stress, anxiety, and psychological discomfort. That reliance began at an early age, when no one had even imagined how the consumption of digital content delivered via a video screen could overwhelm and alter the brain's reward center, in some people, no-less powerfully than placing a bet, taking a drug, or swallowing a drink. Mr. Royle's story tracks the birth and evolution of screen-based addictions that now pervade modern life, profoundly shaping behavior and decision-making in ways research has only begun to measure.

Not everyone who uses a screen to access digital content – be it pornography, video games, gambling sites, or social media – struggles with addiction-like behavior, of course, just as not everyone who drinks a beer suffers from alcoholism. And, not everyone who possesses or accesses illicit online pornography can credibly explain their actions through the lens of an addiction.

However, for those afflicted with the combination of genetic, mental health, and social factors commonly recognized to play a role in addiction, as Mr. Royle is, consuming screen-based pornographic content has emerged as a new means for the disease to manifest itself, with the same destructive results.

Federal agents' arrival at Mr. Royle's doorstep on July 14, 2015 marked a turning point in his life that, improbably, freed him from the isolation, stigma, and shame of fighting a years-long losing battle against compulsive pornography consumption on his own. Over the five and half years since that fateful day, he has devoted himself not just to the process of addiction recovery for himself, but also to helping others locally and globally find relief from and counseling for that same disease. In the words of his psychotherapist, a respected Boston-area forensic psychologist who has treated thousands of similarly-situated people, "Mr. Royle has a dedication to his recovery that is unique. He is, by far, one of the most devoted clients I have seen and his prognosis is excellent."[1]

Respectfully, we submit that for the many reasons recited below, the Court should allow Mr. Royle's good work and recovery to continue by sentencing him to a non-custodial punishment. Incarcerating him would do far more harm to him, his children, and his community, than any theoretical benefit of "general deterrence". It would also fail to account for several other factors of this case that make it unique.

Mr. Royle and his children have suffered enormously in the past five-plus years. His life has already been razed to the ground once, and against the odds, he used the time afforded him by the government's years of delay in bringing this case forward to recover, rebuild, and effect

---

[1] *See* PSR at ¶41.

tangible change for the good his community and around the world. With the Court's grace, that work can continue without the disruption of Mr. Royle's life being destroyed all-over-again.

## II.    PERSONAL BACKGROUND

### A.    Early Life and Upbringing

Mr. Royle, age 45, was born and raised in Northeast Pennsylvania. His father and namesake, who died in 2016, was a small-town lawyer. His mother, still living, was a homemaker. He has two older sisters and a younger brother.

Mr. Royle's father ███████████████████████████ played a significant role in Mr. Royle's upbringing. The family's fortunes waxed and waned ██████████████████████ ███████, which corresponded to job losses, career transitions, and other difficulties. However, it was a problem that – although obvious and consequential for Mr. Royle's everyday life – was never spoken-of during Mr. Royle's childhood. Mr. Royle and his siblings were expected never to discuss those sorts of problems.

███████████████ Mr. Royle idolized his father and sought his approval with determination. They had a close relationship. Which is why, ██████████████████ ██████████████████ at the age of twelve or thirteen, ████████████████ ████████████████████████. ████████████████████████ Mr. Royle began consuming pornography enthusiastically and in secret.

### B.    High-Speed Internet

Mr. Royle left home for Amherst College at age 18, in 1993. In dropping Mr. Royle off at school for the first time, his father left him with a warning: "█████████████████ ███████████████████████████." Mr. Royle followed that advice. He has only



ever consumed alcohol moderately, and – outside of a few puffs of marijuana – has never used drugs.

However, a different and unexpected type of addiction threat awaited Mr. Royle in his college dorm room: high-speed internet access (a brand-new technology back then) and, with it, an unlimited supply of adult pornography. Within months of his first encounter with the online universe, Mr. Royle's consumption of that pornography began taking hours out of his daily life, and it did so for his entire four years of college. Not yet recognizing the toll a growing dependence on porn use would take, he managed to balance it with his school work. He graduated from college on-time, with honors, and was accepted to New York University School of Law, which he deferred for a year to take a job working at the Department of Justice in Washington, D.C.

In D.C. and without the money to pay for a high-speed internet connection, Mr. Royle experienced withdrawal, although he did not realize it at the time. Lacking the daily stimulation and ritual of surfing internet pornography, which he had come to rely on as a means of coping with stress and anxiety, he fell into a depression. He still sought out pornography, however, by ducking into an adult bookstore on 17th Street to rent videos he would watch whenever his roommates left town for the weekend.

### C.    New York, Maine, New York Again

At NYU the next year, Mr. Royle returned to daily binges on internet adult pornography, enabled by the university's high-speed internet connection. This time, however, the habit began to affect his work. He did well at law school, but did not excel, and frequently found himself exhausted from night-long binges on pornography that had begun to feel more like an obligation than a diversion.

Following graduation, Mr. Royle accepted a job with a large law firm, which he deferred to take a federal clerkship in Maine. That year, feeling as if he needed to grow-up and act in a

manner he considered consonant with his privileged role as a law clerk, Mr. Royle for the first time made a concerted effort to curtail his use of pornography. In so doing, he discovered the alarming difficulty of quitting. Using his home computer for any purpose meant engaging in a mental tug-of-war between his desire not to surf porn, and the equally-strong pull of the losing himself in a haze of sexualized digital consumption. To combat the urge, he tried altering his daily routines, took up hobbies, and threw himself into his work. This helped, but the strong urge to return to the comfort and detachment of his computer screen was never far away.

Mr. Royle returned to New York the next year and fell hard into his old patterns. He used his first law firm paycheck to purchase a new computer and a trove of pornography DVDs he could watch on it from a 42nd Street adult bookstore. Over the next few years, he repeatedly threw away those sorts of DVDs in moments of determination to quit using porn, only to buy new ones a few days or weeks later. This was the beginning of a binge-and-quit cycle that played itself out in Mr. Royle's life again, and again, and again, and again, and again, until the day federal agents executed the warrant in this case.

During that time, Mr. Royle met and married his (now-ex) wife. He told her nothing of his porn use. They soon had a baby, a momentous event that inspired Mr. Royle to try to quit again (*for good this time*, he swore to himself). He made it three months before the pressure of a demanding job where 18-hour work days were common, the sleep deprivation that came with raising a newborn, and ███████████████████████████, made the tug of a ready escape into his computer screen irresistible.

### D.  Process Addictions in Context

Before going further, we wish to pause here to give some context to the notion of consuming pornography, or any screen-based content, as an addiction. Virtually everyone, to be sure, has experienced the attention-grabbing effects of scrolling through social media or some

other internet content. In fact, manipulation of a user's primal psychological impulses is a purposeful design feature of today's internet platforms, because it drives the platforms' revenue. The longer an app or website can keep a user engaged, the more information the user's on-screen behaviors communicate, and the higher the user's value to that platform.[2] A well-worn saying in Silicon Valley goes: "If you aren't paying for the product, then you *are* the product." So it is with virtually all internet content distributed for "free," pornography included.[3]

For people susceptible to addiction, however, these design features come with a dangerous downside. Most people can scroll and click through text, video, and imagery and merely feel diverted and, perhaps, unsettlingly captivated. In people prone to addiction, however, those same on-screen actions can feel all-consuming, so much so that they become an end unto themselves; that is, the psychological reward delivered by the <u>process</u> of consuming hyper-stimulating, on-screen content takes on exponentially greater value (or "salience") than any reward the user experiences from the actual content the screen displays. For these unfortunates, an addiction arises around the compulsive process of consuming content *ad infinitum*.[4] The content consumed is the

---

[2] *See* Harris, T., *Optimizing for Engagement: Understanding the Use of Persuasive Technology on Internet Platforms*, testimony before United States Senate Committee on Commerce, Science, and Transportation Subcommittee on Communications, Technology, Innovation and the Internet (June 25, 2019) (describing "a growing asymmetry between the power of technology and human weaknesses"), *available at* https://assets.website-files.com/5f0e1294f002b15080e1f2ff/5f17b46b0b74e3b4314e0427_Testimony-Background-Tristan-Harris_CHT.pdf.

[3] *See, e.g.*, Hodge, K., *If it's free online, you are the product*, The Conversation (April 19, 2018) ("With any service that you use online that is free – including all Google services (Docs, Gmail, Search) all social media services (Snapchat, WhatsApp, Twitter) and even Hotmail – your data is the product.") *available at* https://theconversation.com/if-its-free-online-you-are-the-product-95182.

[4] Cultural anthropologist and New York University professor Natasha Dow Schüll first documented this phenomenon extensively in people addicted to playing video poker. She found that her research subjects reported playing hands not to win, but merely in order to keep playing, and described their fixation on the images in front of them as a "machine zone" in which the connection between user and screen is so intense that it drowns out the user's sense of time or awareness of their surroundings. *See* Dow Schüll, N., *Gambled Away: Video Poker and Self-Suspension*, Anthropology Now 4:2 (2012), *available at* https://www.natashadowschull.org/wp-content/uploads/2018/05/journalart-Schull-AnthroNow-gambled-away-suspension.pdf; Dow Schüll, N., *Machine Narratives: Selections from Interviews with Gambling Addicts*, The Journal of Culture & the Unconscious 2: 2 (2002) (interviews with "machine gamblers [trying] to communicate what it was like to be caught in the circuit of a game in

means, not the end, of the addiction, merely serving as the fuel for continuation of the process. Thus, a common observation in addiction research and treatment is that the anticipation and ritual of consuming a drug-of-choice, rather than achieving an elusive, unattainable high, is associated with the most powerful neurological responses.[5]

Addiction has long been a problem for lawyers. Recent reports have documented the "mental health crisis" in the legal profession, with co-occurring depression, anxiety, and substance abuse among the most common manifestations of attorney psychological distress.[6] For Mr. Royle, addiction manifested itself as a process of compulsively consuming internet pornography on the screen of a computer. No less than any other addiction, it represented an effort to escape from his distress by erasing his sense of time and his awareness of his surroundings.

Mr. Royle was not alone in struggling with this emerging type of addiction. By 2014, the World Health Organization ("WHO") had come to recognize internet use-related behavioral addiction as a growing global public health concern in "urgent need" of "novel, international-level research" to address it.[7] A growing body of research has since observed addiction-related brain changes in compulsive internet pornography consumers,[8] and in compulsive screen-content

---

which winning is beside the point, in which there is no final move, no possibility of resolution."), *available at* https://www.natashadowschull.org/wp-content/uploads/2018/05/journalart-Schull-PsyAna-machine-narratives.pdf.

[5] *See, e.g.*, Greenfield, D., *Treatment Considerations in Internet and Video Game Addiction: A Qualitative Discussion*, Child Adolesc. Psychiatric. Clin. N. Am. 27 (2018) at 327–344, ("Considerable research suggests that the stronger levels of dopamine occur in conjunction with anticipation of reward than with reward itself."), *available at* https://doi.org/10.1016/j.chc.2017.11.007

[6] *See* Krause, C. and Chong, J., *Lawyer Wellbeing as a Crisis of the Profession*, S. Car. L. Rev. 71:2 (2019), *available at* http://dx.doi.org/10.2139/ssrn.3464992.

[7] *See* World Health Organization, *Public Health Implications of Excessive Use of the Internet, Computers, Smartphones and Similar Electronic Devices Meeting Report* (2014), 11, *available at* https://apps.who.int/iris/bitstream/handle/10665/184264/9789241509367_eng.pdf?sequence=1&isAllowed=y.

[8] *See, e.g.*, Love, T.; Laier, C.; Brand, M.; Hatch, L.; Hajela, R. *Neuroscience of Internet Pornography Addiction: A Review and Update,* Behav. Sci. 2015, 5, 388-433. (reviewing research literature), *available at* https://doi.org/10.3390/bs5030388. For a complete collection of current research on pornography consumption as a behavioral (or "process") addiction, *see* https://www.yourbrainonporn.com/relevant-research-and-articles-about-the-studies/.

consumers generally.[9] Recently, a group of fifteen leading experts in the field opined that a sufficient clinical, theoretical, and empirical basis now exists to classify problematic internet pornography use in the WHO's International Classification of Diseases (ICD-11) as a "disorder due to addictive behavior."[10]

We recognize that the notion of an addiction of this sort, or of any other, is a difficult concept for non-addicts to conceive. It is, however, essential to understanding how Mr. Royle arrived at this point in his life, and to understanding his testimony at trial that he did not want to see or purposefully seek-out the illicit images on which the government's case rested, despite the compulsive actions that called them to his computer screen. Those images, and the tens of thousands of other, non-illicit images the government also recovered from the computer, fueled Mr. Royle's consumption of porn during a binge, but they were not his aim. His aim was simply to keep consuming – for there to be a next image, and a next one, and a next one, without end, so that he would not have to leave the comfort of the "zone" in which the world and its many stresses and troubles disappeared, and all that was left was him and the computer screen.

### E.      "White Knuckle" Descent

The remainder of Mr. Royle's story leading up to July 14, 2015 is one typical of any struggle with addiction, involving an escalating series of fruitless efforts to deal with the problem on his own, as it slowly but inevitably eroded the foundations of his life. Mr. Royle and his then-wife decided to leave New York and move to Maine with their young son, seeking a calmer life.

---

[9] *See* Internet & Video Game Addiction (collection of studies on internet consumption and video game playing as addictions), *available at* https://www.yourbrainonporn.com/relevant-research-and-articles-about-the-studies/internet-video-game-addiction/.

[10] *See* Brand, M. et al., *Which conditions should be considered as disorders in the International Classification of Diseases (ICD-11) designation of "other specified disorders due to addictive behaviors"*?, Journal of Behavioral Addictions (June 30, 2020), *available at* https://akjournals.com/view/journals/2006/aop/article-10.1556-2006.2020.00035/article-10.1556-2006.2020.00035.xml.

Mr. Royle took a job with a local Portland law firm. For a few months, the slower professional and personal pace gave Mr. Royle some purchase in his efforts to resist pornography use. But then, in quick succession, came the kinds of life challenges that always eventually foster strain: Mr. Royle's father had a massive stroke that nearly took his life ███████████████; Mr. Royle and his wife ████████████████████████████████████████████████████████████ ███████; Mr. Royle experienced a setback ████████████ at work; Mr. Royle's wife ████ ████████████████████████████████████████████████████████████████ ███████. People who do not struggle with addiction can often roll with these punches; people with addiction, however, frequently experience them as triggers.

Mr. Royle fell back into to a cycle of nightly, hours-long porn consumption binges followed by fruitless efforts at quitting. Among other "white knuckle" efforts to beat addiction on his own between 2010 and 2015, Mr. Royle tried:

- Locking his personal computer in his car, so that it was not inside the house when the urge to use pornography might strike;

- Changing up his nightly routines, such as by sitting in different chairs in his living room, binging television shows, or going to sleep early;

- Downloading internet filtering software called K-9 Web Protection to his personal computer that blocked pornography and had password-protected settings, then devising elaborate, random passwords that he could not remember, but which, just in case he needed them, he would write on a slip of paper he placed ███████ ████████████████████████████████, or in a desk drawer at work, where he could not get to it at night;

- ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████; and

- ████████████████████████████████████████████, disclosing his struggle with pornography to his wife. (Unfortunately, her reaction to this news was the opposite of what he had hoped. ███████████████████████ Soon after, ████ ████████████████████████████████████████████████████ )

### F.        Transgression

As the Court knows, Mr. Royle's downward spiral of online pornography use eventually began to involve contact with contraband imagery. He visited websites where licit and illicit content were commingled. Fueled by a desire for the highest possible volume of content, he used peer-to-peer software to download vast amounts of material, including contraband, indiscriminately, using broad sexual search terms and "selecting all" for download rather than sorting through search results. He typed searches into web search engines using terms that, although they were common terms used in mainstream adult pornography,[11] could also yield illicit search results. This was reckless. Some might even call it insane. Mr. Royle knew it was wrong and destructive. Many of the images he saw – licit and illicit alike – sickened him. He tried over and over to stop himself from disappearing into a rabbit hole of pornography. But he failed.

He failed because he could not bring himself to do the one thing that most addicts eventually discover they must do if they want to get and stay sober: fully, transparently admit to someone who understands and is willing to help that they are powerless to control their addictive sexual behavior on their own, and that their lives have become unmanageable. He failed because his ego and his self-image refused to allow for the possibility that this was a problem intelligence and hard work simply could not fix. He failed because he convinced himself that revealing the depth and desperation of his dependence on consuming porn would result in public humiliation, career suicide, and ████████████████████ (ironically, the exact outcomes that self-

---

[11] For example, Pornhub, one of the world's largest pornography websites which boasts more than 40 billion unique visits per year, reported in early 2016 that "teen" was one of the most common search terms on its site in 2015, and Pornhub itself features hundreds of thousands of items of adult pornographic content labeled with terms like "teen", "young", "jailbait", and "virgin". *See The United States Top Searches* Pornhub Insights (Feb. 26, 2016) *available at* https://www.pornhub.com/insights/united-states-top-searches (NB: Pornhub Insights is a Pornhub-affiliated website that publishes data and statistics about PornHub users' behavior. It is a "safe for work" publication that does not feature pornographic imagery.)

deception ultimately caused). He failed because he feared others would reject him in the same manner ████████████████████████████████████.

### G.    Rock Bottom

Rock bottom came, as it always does for people who delude themselves this way. For Mr. Royle, it was the knock on his front door by a Homeland Security Investigations agent on July 14, 2015.

Execution of a search warrant at Mr. Royle's house that morning ended his life as he knew it. His ex-wife immediately took the children and refused him access to them. He soon lost his job, his reputation, his career, his closest personal relationships, and his life savings. The government would not charge Mr. Royle until more than three years later, but on that day, every meaningful aspect of the life he had built on the shaky foundation of a raging addiction came crashing down around him.

But life also began anew. And that is where we want to focus the rest of this Personal Background. Because, what followed that abrupt and cataclysmic downfall illustrates why Mr. Royle's story is different from so many others, and why he merits a lenient sentence.

### H.    The Real George Royle

To understand what drove Mr. Royle to react as he did to hitting bottom, it helps to hear from those who know his character best. In the coming days, we will submit to the Court a body of letters from people who know Mr. Royle across all areas of his life. They will describe his devotion to his children and to playing a role in their lives; his commitment to doing the "right thing" first-and-foremost; his generosity with his time in helping others, even in his own darkest personal moments; and the tangible and continuing positive impacts he makes in their lives and the lives of others.

The positive attributes others have long seen in Mr. Royle are no illusion. They describe Mr. Royle to-a-"T", in fact. Addiction thrives in isolation, and Mr. Royle compartmentalized his so-completely that it stayed hidden from everyone in his life for years while he went to ever-more intense extremes to rein it in. That, too, is a common story of addiction: a pattern of behavior that so conflicts with a person's values and beliefs, and is so unsustainable, that it eventually tears life to pieces.

## I.      Recovery

You can learn a lot about a person's character, however, by how he responds to hitting rock bottom in the manner Mr. Royle did. Many withdraw further, too ashamed to face the world. A tragic number take (or attempt to take) their own lives. Others may turn to violence, new drugs of addiction, or similarly-dangerous outlets.

Mr. Royle did none of these. Instead, he recognized that his futile, delusional efforts to overcome his addiction on his own had brought about the very life consequences he had wanted to avoid. The only way forward was to do what he had previously rejected as unthinkable: admit defeat and powerlessness out loud (not just to himself), and humbly ask other human beings who understood his struggle for help.

Mr. Royle attended his first 12-step meeting of any kind two days after the search warrant, and there for the first time ever voiced aloud that he was "an addict." He attended his first such meeting for people who struggle with sexual addictions a few days after that, admitting aloud that he was "a sex addict." Mr. Royle had long assumed that saying such things to a room full of strangers would amount to a catastrophe of humiliation and shame. Instead, he experienced the liberating embrace of a fellowship of men and women who understood and empathized with his struggle, because it was theirs, too. ██████████████████ when he talked of hiding passwords from himself, and of looking himself in the mirror and promising *this time, it'll be different*. ██████

████████████████████████████████████████████████
████████████████████████████.

Mr. Royle is not an especially religious man, but without exaggeration or hyperbole, those meetings were transformational, spiritually-enlightening experiences. He soon got a sponsor. He started "working the steps." He battled through withdrawal and, on the other side, for the first time encountered a sobriety that felt secure and lasting, instead of like hanging over an abyss on a thread that would inevitably break.

After a little more than a year in recovery, Mr. Royle offered to serve ████████████. He turned the skills he had developed as a lawyer to ████████████████████ ████████████████████. ████████████████, Mr. Royle felt his own recovery strengthen.

**J.      Sobriety**

Today, Mr. Royle has five and a half years of sobriety from pornography consumption under his belt.

What is different from the past?

Simply put, Mr. Royle lives his recovery openly and honestly. He participates in 12-step activities and meets or speaks ████████████████ on a regular basis. He talks candidly about his addiction with people close to him. He uses the practical and spiritual tools he has gained through his recovery program to acknowledge and communicate with others about his moments of stress and anxiety, instead of turning inward and toward a computer screen to cope with them.

Through this rigorous transparency about his recovery, he has gained – and returned – the steadfast support of close friends and members of his fellowship. As just one tangible example:

████████████████████████████████████████████████
████████████████████████████████████████████████

████. In this way, Mr. Royle and his fellows in recovery hold each other accountable. Another example: Mr. Royle makes himself available ████████████████████████████ ████, ensuring that they always have an outlet and understanding ear when life becomes difficult.

In the midst of addiction, the idea of regularly sharing intimate and potentially embarrassing information about himself with another person seemed unfathomable to Mr. Royle. It went against every lesson he had learned as a child, and against decades of engrained habit. Now in recovery, however, Mr. Royle has embraced this communication as *the* essential element of long-term sobriety. By allowing himself to "be known" to others who understand and share his challenges, he lives a life unburdened by the shame and isolation on which his addiction thrived.

## K.    Service

As Mr. Royle's recovery strengthened, he also recognized that he could do more to help people who struggle. In the depths of his addiction, he had periodically searched the internet for resources that might help him quit, only to find a disorganized grab-bag of internet forums, evangelical ministries, expensive rehab centers, and hucksters selling wonder-cures. Back then, no one in Maine was trained to treat screen-based sexual addictions. Few even recognized their growing significance. Now in recovery, Mr. Royle realized that the internet needed a place for people like him who, in their moments of desperation to quit using porn, went looking for a clear, simple explanation of their options, and for help local to them.

So, he built it. After months of research, Mr. Royle launched a website that collected, organized, and explained in simple language the full breadth of options, services, tools, and providers who might help someone overcome compulsive pornography use. It presented information in a non-judgmental, unbiased format, aiming to reach the broadest possible audience. The reaction to the launch was uniformly positive and enthusiastic. Mental health professionals

praised the website's comprehensive and user-friendly listings explaining where and how to seek help for a porn-use problem. Prominent figures in media, research, entertainment, and sports who studied, or had struggled with, porn use began following the site on social media and amplifying its message. Today the social media account of the site has a following of thousands, and continues to grow.

Most importantly, men and women began contacting the website directly and through social media, ███████████████████████████. In most cases, ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████. They sought help from all over the United States, and from around the world. They lived in tiny towns and major cities. They represented all ages, ethnicities, genders, and sexual orientations. They shared but one commonality: ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.

In the past four and a half years, Mr. Royle has directly helped well over a hundred men and women ███████████████████████████████████████, and has given advice and encouragement to many more. As a result of his service, he has gained a reputation within therapeutic and pornography-awareness communities as a trusted ally and devoted advocate. He has even been invited to serve on the board of a national sexual health organization (an honor he regrettably had to decline because of the uncertainty of his situation and not wanting to harm the organization's work), and to speak at a major conference on the impact of online pornography.

Mr. Royle did – and continues to do – this work without compensation or pecuniary benefit of any kind. His website does not sell advertising space. It does not endorse products or providers. It does not seek or accept contributions. It does not promote Mr. Royle personally – in fact, it does not even mention his name. Its operating expenses come out of Mr. Royle's pocket, and no one else's. Running the site and helping people in need who he is uniquely situated to assist is Mr. Royle's act of service to the community. He does it because he believes it is vitally important work.

And it is. Mr. Royld's efforts happen on the front-line of addressing and combating the tangible and devastating harms of screen-based addictions, of which compulsive use of internet pornography is one of the two most significant (the other is video gaming). His work gives people struggling in secret and isolation an immediate, accessible, low-risk way to come out of the proverbial shadows to ask for help curtailing behaviors they recognize as destructive and harmful to themselves and others. Had this sort of resource existed in his own moments of trying to quit, Mr. Royle believes he would have found the support and sobriety he craved, and that he would have averted the calamity that has consumed his life. Then again, he also recognizes that had the calamity not occurred, the men and women he has helped may have continued in their own downward spirals. It is, after all, a fundamental tenet of recovery that "No matter how far down the scale we have gone, we will see how our experience can benefit others."

### III.    OBJECTIONS TO PRE-SENTENCE REPORT AND GUIDELINES CALCULATION

### A.    The Court should not adjust the advisory guidelines range upwards under USSG §3C1.1 for obstruction of justice, because Mr. Royle did not commit perjury.

The PSR recommends a two-level enhancement of Mr. Royle's sentencing guidelines range for obstruction of justice pursuant to USSG §3C1.1, arguing that Mr. Royle committed

perjury by denying that he purposefully obtained child pornography. The Court should reject this recommendation.

Mr. Royle did not lie on the witness stand, and the jury did not "squarely reject" his testimony. As the Court observed in its Memorandum Order dated May 22, 2020, the jury may well have credited Mr. Royle's testimony and still found him guilty of knowing possession, intentional accessing, or attempt, because his testimony "provide[d] evidence that he continued to visit websites and to download images through peer-to-peer software after recognizing that those sites and downloads contained child pornography."[12] The Court recognized that Mr. Royle denied wanting illicit material, "[b]ut the fact that he continued to visit websites or to mass-download files using peer-to-peer software after these occurrences supports the jury's conclusion that he knowingly accessed and downloaded child pornography." In other words, the Court determined it was not necessary for the jury to have found that Mr. Royle wanted or took a prurient interest in child pornography (which he denied, truthfully), only that he was aware of the existence of contraband images at web sites or in search results and continued engage with those sources anyway (which he admitted, also truthfully).

Mr. Royle testified candidly and forthrightly about struggling with compulsive use of internet pornography, and of his awareness and distress when the behavior began to bring him in contact with contraband material. Addiction is not an excuse for illegality. However, it is an explanation for how a person can transgress on the internet without having a deviant sexual interest in child abuse imagery. The thrust of the government's argument at trial was that Mr. Royle was *that kind of person*, which is (to our mind) the worst thing that can be said about a human being.

---

[12] Memorandum Order dated May 22, 2020 (Docket No. 162) at 35-36, n. 107.

Mr. Royle's testimony truthfully, forcefully refuted that accusation. We submit that he should not be penalized for testifying honestly about his own fundamental humanity and morality.

**B.      The Court should not apply a five-level enhancement for possession of more than 600 images, because the government has not proven that number of images.**

The PSR recommends a five-level enhancement under USSG §2G2.2(b)(7)(D) for possession of more than 600 images of child pornography. Citing the forensic report prepared by Special Agent Plumb, the PSR contends that the computer contained 711 unique images, and 1 video, that met the definition of child pornography.

To begin, no video constituting child pornography was recovered from the computer, and the forensic report cited in the PSR does not say otherwise. The PSR's reference to a video appears to be in error.

The forensic report does claim that 711 unique contraband images were found in the unallocated space of the computer, where Mr. Royle could not access them (no such images were found stored or saved in allocated space). However, the government only introduced 17 such images into evidence at trial. To date, the government has not attempted to prove the existence or illicit nature of the remainder.

Agent Plumb also testified that any image located in the unallocated space of the computer could well have ended up there without a computer user's knowledge or intent, through the automated processes of pre-fetching and caching. Even assuming the jury's verdict reflects a determination that all 17 of the images the government proved at trial ended up in the computer's unallocated space through Mr. Royle's knowing conduct, one cannot merely assume that the other 694 images (assuming they constitute illicit material) did also. On information and belief, many of the images referred-to in Plumb's report are tiny and of poor resolution, suggesting that they were never "clicked-on" or otherwise intentionally accessed.

**C.** **Accordingly, an advisory offense level of 22 is appropriate.**

For the foregoing reasons, we respectfully submit that an advisory Sentencing Guidelines offense level of **22**, not 29 as urged in the PSR, is the appropriate figure for the Court to use here.

**IV.** **A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE**

Based upon the sentencing factors set forth in 18 U.S.C. §3553(a), and the extraordinary circumstances of this case, we respectfully submit that a non-custodial sentence of probation or home confinement is appropriate in this case.

**A.** **A non-custodial sentence would reflect Mr. Royle's good history and characteristics.**

The Supreme Court has directed that 18 U.S.C. § 3553(a) contains a "broad command to consider . . . the history and characteristics of the defendant" when imposing a sentence. *Gall v. United States*, 552 U.S. 38, 50 n.6, 128 S.Ct. 586, 597 n.6 (2007) (internal quotations omitted).

In some respects, Mr. Royle's story is probably far more common than people recognize. Addiction is a common disease. Internet pornography use is ubiquitous. If just one percent of users who, like Mr. Royle, have no criminal history, encounter problems with compulsive internet behaviors involving pornography, then that amounts to millions of people, the vast majority of them struggling in shame and silence.

In other respects, however, Mr. Royle's story is unique. Vanishingly few people whose lives collapse under the weight of addiction and its consequences respond as Mr. Royle did. That he used the time afforded him by the government pre-trial to raise his life from the ashes and to commit himself to a lasting and durable recovery serves as testament to the good character described in the letters attached from people who know Mr. Royle well. So does his therapist's

assessment that he stands out among thousands of similarly-situated men and women in his dedication to recovery and his prognosis for continued success. And, so does the fact that throughout this calamitous period of his life, Mr. Royle has stayed present and consistent ██ ████████████████████████████████████████████████████████████.

Also unique is Mr. Royle's demonstrated commitment to helping others, which has shown tangible and increasingly-significant results in the local and global community. In the past five-plus years, Mr. Royle has devoted countless hours to supporting ████████████████. He has also singlehandedly, and directly, deterred problematic compulsive pornography use in the broader national and global community through outreach to people in need.

A non-custodial sentence, in other words, would serve the ends of specific and general deterrence far more than a custodial sentence would in this case. Mr. Royle's recovery and the ongoing reconstruction of his life are active, living endeavors. He has made extraordinary strides in healing himself and helping others under exceedingly dire circumstances. Today, he benefits from a strong network of recovery support, increasingly-steady employment, and a stable living situation. We submit that a non-custodial sentence would preserve those precious gains and the foundation they have supplied for Mr. Royle's recovery. It would also allow Mr. Royle to continue his significant good works in the community that routinely deter problematic pornography use by others.

**B.     A non-custodial sentence accurately reflects the nature and circumstances of Mr. Royle's conduct and is sufficient, but not greater than necessary, provide meaningful punishment.**

A destructive spiral of addiction led to Mr. Royle possessing/accessing child pornography. That does not excuse Mr. Royle's actions. It does, however, provide important context for determining an appropriate punishment for them.

Importantly, the evidence shows that Mr. Royle tried, albeit unsuccessfully, to manage his pornography use on his own. Trying to fix a problem the same way again and again, expecting a different result, was certainly foolhardy of him. However, he is hardly the first person to make that mistake in the throes of an addiction. A felony conviction and mandatory registration will follow Mr. Royle for the rest of his life, to remind him of the hubris and insanity of thinking he could overcome an addiction through self-help, in isolation.

Without minimizing the evil of child pornography in the slightest, we submit the evidence also shows that the contraband imagery Mr. Royle was found guilty of possessing/accessing falls at the lowest end of the spectrum of possible content in terms of its severity. The images recovered from the computer contained no violent or sadomasochistic content. The bulk of them depicted teenagers, and mostly comprised small-scale, still-frame images of females engaging in web-chats. The sources of the images appeared to consist entirely of publicly-accessible internet websites that had been indexed by major search engines. Mr. Royle had not actively engaged with a community of collectors in order to obtain those images, and had not paid for them. To repeat, we do not seek to minimize the seriousness of possessing *any* type of child pornography, but rather, merely wish to place the content at issue here within the broader context of the type of material that has regrettably spread to every corner of the internet in the past decade.[13]

---

[13] We respectfully urge the Court to treat with extreme skepticism any claim by the government here that mainstream, adult pornography websites do not harbor illicit content and/or links to such content. Nothing could be further from the truth, as evidenced by volumes of investigative reporting, advocacy by anti-pornography groups and their political allies, and the Department of Justice's own prosecutions of such websites for producing and hosting precisely that kind of content. *See, e.g.*, Keller, M. and Dance, G., *The Internet is Overrun by Images of Child Sexual Abuse. What Went Wrong?*, N.Y.Times (Sept. 29, 2019) *available at* https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html?action=click&module=Top%20Stories&pgtype=Homepage; Batty, D., *Criminals Hide Child Abuse Images Behind Legal Porn Sites*, The Guardian (Apr. 20, 2016) *available at* https://www.theguardian.com/technology/2016/apr/21/criminals-hide-child-abuse-images-behind-legal-porn-sites; Schuster, A., *1.5 Million Sign Petition To Shut Down Pornhub For Child Pornography, Sexual Abuse*, The Federalist (July 27, 2020) *available at* https://thefederalist.com/2020/07/27/1-5-million-sign-petition-to-shut-down-pornhub-for-child-pornography-sexual-abuse/; Birnbaum, E., *GOP senator calls for DOJ investigation into Pornhub over videos of sex trafficking victims*, The Hill (March 10, 2020) *available at* https://thehill.com/policy/technology/486869-

The 711 images alleged to constitute child pornography, moreover, comprised just 3.5% of the 20,183 images recovered through forensic techniques from the unallocated space of the computer, and approximately 0.35% of the total number of the more than 200,000 digital images on the computer as a whole (which includes those located in allocated space, where *no* child pornography was found). According to pre-trial representations made to undersigned counsel by Agent Plumb (via government counsel), a far greater proportion of the images recovered from unallocated space of the computer consisted of legal pornography. The images had not been stored in any sort of collection, and were only found in the inaccessible, space of the computer.

Finally, the evidence shows that Mr. Royle harbors no inappropriate sexual interest in children, and poses no risk of recidivism. The public would gain nothing from his removal from the community. Just the opposite: a custodial sentence would inflict significant, avoidable costs that would harm the public and Mr. Royle's ███████. It would disrupt his good works described above. It would exponentially deepen his financial straits and impair his earning ability. And, it would deprive ████████████████████████████████████████████ ██ .

## C.     The calculated sentencing range does not accurately reflect Mr. Royle's conduct.

Over the past decade or so, federal courts have voiced strident criticism of the Sentencing Guidelines' child pornography provisions.[14] All too often, those Guidelines suggest a range of

---

gop-senator-calls-for-doj-investigation-into-pornhub-over-videos-of-sex; *United States v. R.V.*, 157 F.Supp.3d. 207, 233-35 (E.D.N.Y. 2016) (discussing widespread availability of illicit pornography and quoting DOJ-sponsored report that acknowledges "child pornography images may be embedded in general pornography [web]sites"); Indictment in *United States v. Wolfe et al.*, 19-cr-4488-JLS (S.D.Cal. Nov. 6, 2019) (charging owners/operators of ostensibly mainstream, adult pornography website GirlsDoPorn, which distributed content on its own site and via major mainstream pornography platforms like PornHub, with production of child pornography and child sex trafficking).

[14] *See United States v. R.V.*, 157 F.Supp.3d. 207, 262-64 (E.D.N.Y. 2016) (collecting cases).

punishment far harsher than appropriate for a possession-only, non-contact crime.[15] Today, more than half of all of child pornography sentences vary downward from the recommended guidelines range.[16]

Enhancements for the age of the subject of the child pornography (§2G2.2(b)(2)), use of a computer in the offense (§2G2.2(b)(6)), and 600+ images (§2G2.2(b)(7)(D)) have been singled out as contributing to disproportionately harsh sentencing ranges for child pornography possession crimes. The United States Sentencing Commission reports[17] that more than 95% of all child pornography sentencing calculations involve a (b)(2) and (b)(6) enhancement, and 77% involve enhancements for 600+ images under (b)(7)(D), making those enhancement (in the words of the Second Circuit) "all-but-inherent" in child pornography possession and accessing cases.[18]

Accordingly, we submit the Court should disregard the sentencing range insofar as it reflects the "irrationality" of the current child pornography Guidelines, and does not in any sense capture the nature of Mr. Royle's conduct.[19] Specifically:

- In this day and age, virtually every conviction for possessing or accessing child pornography involves use of a computer and the internet. If anything, possessing or accessing child pornography *without* having used a computer and the internet would seem a far more troubling behavior, insofar as it would require significantly more effort and intentionality for the average person than merely clicking a link on a computer screen (particularly clicking a link while in the midst of an addiction-type bender).[20]

---

[15] *See United States v. Dorvee*, 616 F.3d 174, 185 (2d Cir. 2010) (describing Sentencing Guidelines for child pornography crimes as "fundamentally different from most" because "unless applied with great care, [they] can lead to unreasonable sentences that are inconsistent with what § 3553 requires.").

[16] U.S. Sentencing Comm'n, 2019 Sourcebook of Fed. Sentencing Statistics tbl. 31, 40 (2019), *available at* https://www.ussc.gov/research/sourcebook-2019.

[17] See U.S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics (Offender Based), Fiscal Year 2019*, 44-45, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Offender_Based.pdf.

[18] *See, e.g.*, *United States v. Jenkins*, 854 F.3d 181, 189 (2d Cir. 2017).

[19] *Id.*

[20] *See R.V.*, 157 F.Supp.3d at 225-238 (describing effect of technological revolution on accessibility of child pornography).

- With respect to the age of subjects, the forensic examiner reported that approximately 96.5% of the 20,183 images retrieved from the unallocated space of the computer (not to mention the more than 200,000 images on the computer as a whole) in Mr. Royle's case did not constitute child pornography at all. Of those that purportedly did, we suspect only a fraction reflected a subject who could be definitively identified as either under 12 or prepubescent. Given the context in which Mr. Royle's consumption of pornography took place, this tiny sliver of the imagery does not accurately reflect the nature of the possession or accessing at issue here.

- The number of images recovered from the computer's unallocated space is a misleading measure of Mr. Royle's conduct. Mr. Royle was not a hoarder or saver of child exploitation material. The 711 images here did not comprise a "collection" in any sense of the word. Mr. Royle was an addict whose addiction manifested itself in hours-long, high-volume pornography consumption binges that he tried repeatedly, albeit unsuccessfully, to stop. A sentencing calculation based on a number of images in Mr. Royle's case effectively amounts to giving him extra punishment for struggling with addiction.

**D.      A downward variance is consistent with Mr. Royle's acceptance of responsibility for his actions.**

The PSR highlighted Mr. Royle having chosen to go to trial as a reason he should not receive credit for acceptance of responsibility. Technical strictures of the Sentencing Guidelines aside, however, we submit that Mr. Royle has, in fact, accepted responsibility for his actions in meaningful ways that merit the Court's consideration.

The Court here determined that the jury's guilty verdict was not necessarily inconsistent with Mr. Royle's testimony. In that testimony, Mr. Royle acknowledged having encountered contraband material online, having engaged with the online sources of that material more than once, and having used search terms that could yield both licit and illicit results. What he denied was that this conduct reflected (as alleged by the government) a prurient interest in child exploitation imagery, which carried with it the implication that he is the type of person who would intentionally harm a child. He is not that kind of person, and should not be penalized for truthfully refusing to say otherwise.

Moreover, from the day agents executed a warrant on his house and blew the proverbial lid off of his addiction, Mr. Royle has thrown himself into a determined, sincere, and undeniably-successful effort to acknowledge and atone for his compulsive use of internet pornography and to combat its harms in society at-large. Without exaggeration, Mr. Royle has lived and breathed the process of accepting responsibility for his actions every day of the past five-plus years, the first three-and-a-half of which elapsed before he was charged.

As the Court knows, accepting responsibility is not necessarily synonymous with pleading guilty, and that there are circumstances in which the implications of the latter are so severe that it would be unjust to punish a person for not opting to do so. In Mr. Royle's case, pleading guilty would have amounted to voluntary submitting himself to a draconian system of sex offender registration that stigmatizes and marginalizes registrants for the rest of their lives, making it difficult (if not impossible) to find employment or housing, to participate meaningfully in their communities, and to travel for work or leisure. That policymakers justify registration as a means of protecting public safety, moreover, makes it doubly-punitive in cases like this one, in which everyone agrees that Mr. Royle does not pose the slightest danger to the community.

Here, accepting the stigma of registration would also have meant agreeing to inflict significant harm ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████.

**E.  A non-custodial sentence is sufficient, but not greater than necessary, to provide for just punishment in the context of the unique history of this case.**

Before trial, Mr. Royle moved to suppress evidence the government seized at his home. His argument in favor of suppression highlighted the government's years-long delay in taking action in his case, which materially weakened his ability to respond to the charges once filed. The Court denied the motion, but in so doing, recognized that the government's years of inaction merited consideration at some future stage of the case. We respectfully submit this is the appropriate time to consider that delay.

There are no statutes of limitation in cases such as this, and we do not dispute that the government acts at its own prerogative in deciding when and how to charge a defendant. We also acknowledge that severe family, career, personal, and financial consequences happen to anyone convicted of a crime.

That said, there is a material difference between the occurrence of those consequences in the ordinary course, and government (in)action that substantially and needlessly exacerbates them. Here, the government has acknowledged that a significant portion of the years of delay in charging Mr. Royle resulted from the matter having simply been put on the back-burner in the U.S. Attorney's Office. The delay served no purpose vis-à-vis case investigation or prosecution. It merely reflected the government's assessment that did not see Mr. Royle as a danger to the community and it had more important things to do.

Mr. Royle, however, did not know that at the time. He lived the three years that passed following the search warrant under the proverbial Sword of Damocles. The government periodically signaled its intention to prosecute Mr. Royle, but then repeatedly failed to match those statements (in one instance, for a whole year) with action. What is a person to think, and how is he to lead his life, when the government exercises its awesome powers this way?

For Mr. Royle, the passage of time and the uncertainty that came with these mixed messages brought about the sort of life catastrophes that are typical of a prosecution, conviction, and sentence, but before charges had ever been filed. Even as he threw himself into recovery and service, Mr. Royle lived in a state of maddening limbo that exacted a severe and mounting professional, financial, and personal toll. Not knowing when (or, as time passed, if) he would face a prosecution, Mr. Royle could not make meaningful plans for the future or seek steady employment. Though he still held a law license, he could not ethically represent clients without disclosing he could be charged with a federal crime at any moment (which is to say, there was no practical way for him to continue in law practice). His lack of an income, and the uncertainty about how long that might last, left him with no choice but to liquidate his retirement savings, and then sell his house, to pay debts and everyday expenses, and to ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████.

By the time the government finally got around to acting on its stated intentions to prosecute him, Mr. Royle was flat broke, his career in shambles. He borrowed heavily from friends to afford his legal defense. His sole income was from freelance writing, an endeavor that has only recently begun to provide a sustainable level of income.

████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████

The government knew well that its inaction was causing extreme hardship. Mr. Royle's attorney repeatedly told them as much. The government has also acknowledged that Mr. Royle's ex-wife, Anne Hardcastle, and her family law attorney, frequently contacted federal agents, the Victim and Witness Advocate in the U.S. Attorney's Office, and the Assistant United States Attorney himself, all of whom entertained those interactions despite the fact that Ms. Hardcastle was neither a victim nor a witness in this matter. The ostensible purpose of Ms. Hardcastle's outreach was to seek updates on the uncharged case against Mr. Royle and to complain how the continuing uncertainty made it difficult ███████████████████████████████████. Apparently unsatisfied with the answers she was getting, Ms. Hardcastle also enlisted the help of her congressional representative, whose office sent at least two written messages to the government requesting updates and urging that Mr. Royle be prosecuted promptly ████████ ███████████████████████████████.[21]

In short, during an extended pre-indictment period, the government took actions (and inactions) that unilaterally exacerbated and prolonged the negative consequences to Mr. Royle of this prosecution. That may have been the government's prerogative to do. However, just because the government <u>can</u> harm a person's life through pre-indictment delay and mixed-messages does not mean it should, or that a court should ignore the harm done when it occurs.

---

[21] Specifically, the messages falsely and baselessly insinuated that a prosecution was necessary to prevent Mr. Royle from harming his children. This defamatory accusation, coming as it did from a politically powerful source, appeared to spur the government to action. The government's year-long period of silence in Mr. Royle's case ended a day after it received the first letter in May 2018, and the government began its final push to charge him on the heels of the second arriving in October 2018.

Mr. Royle received no notice of these messages at the time, and had no opportunity to defend himself against the numerous false accusations they contained. When he learned of them more than a year later in Fall 2019, he complained to the congressional representative's office and its legal counsel. Their response in a nutshell (to paraphrase): *Get over it*.

We respectfully submit that because the government chose a course of action that, for all intents-and-purposes, front-loaded material consequences of a conviction into the pre-indictment phase of this case, a non-custodial sentence is appropriate to avoid re-inflicting those same consequences on Mr. Royle a second time.

**F.      A non-custodial sentence is sufficient, but not greater than necessary, to provide for just punishment during this time of global pandemic.**

Finally, we respectfully submit that the Court should take Mr. Royle's health and the currently-intensifying COVID-19 pandemic into account in choosing his sentence. To his knowledge, Mr. Royle has not been infected with COVID-19. He has sheltered in place, with minimal contact with anyone outside of his household, since the pandemic began.

Mr. Royle's pulmonary doctor has urged[22] that he not be placed in a congregate living situation, for fear of the potential for infection and complication due to his ███████████, which has twice led to his hospitalization as an adult and is controlled only by ██████████████████ ███. Although the Bureau of Prisons has made efforts to control the spread of COVID-19 within its facilities, virtually none has *not* had a case among its staff or inmate populations,[23] and we have witnessed time-and-again the futility preventing outbreaks in the face of symptomatic and asymptomatic spread in close-quarters settings like nursing homes, cruise ships, and prisons.

Subjecting anyone to prison at this moment, much less a person like Mr. Royle who suffers from a health condition that risks exacerbating the effects of the disease, represents a high-risk gamble. Cases are again on the rise nationwide[24] and, even more troublingly, within the federal

---

[22] *See* PSR at ¶38.

[23] Current Bureau of Prisons COVID-19 statistics *available at* https://www.bop.gov/coronavirus/ (listing cases by facility).

[24] Current COVID-19 tracking statistics *available at* https://coronavirus.jhu.edu/data/cumulative-cases.

prison system.[25] Death is a realistic outcome of an infection for people with underlying conditions, including asthma.[26] Current research also suggests that survivable, and even asymptomatic, cases of COVID-19 leave patients with lasting damage to vital organs.[27] Having the disease may also constitute a "pre-existing condition" that could put patients' future access to healthcare at risk.[28]

We submit that the Court should take those risks into account in sentencing Mr. Royle. To send a health-compromised person into the petri-dish environment of a prison in the midst of a resurgent pandemic is to condemn that person to a non-negligible risk of death or permanent disability. Perhaps that constitutes a worthwhile trade-off in cases where the public needs protection from that person. We submit, however, that the trade-off would be unjust and immoral in the case of Mr. Royle, who faces years of mandatory sex-offender registration and the legal and public stigma that accompany that designation, who has already suffered devastating consequences because of the government's unilateral, pre-indictment action and inaction, and who has demonstrated over the years since an extraordinary commitment to recovery and acts of service.

---

[25] Current BOP case number tracking *available at* https://www.levittandkaizer.com

[26] Centers for Disease Control and Prevention, *Characteristics of Persons Who Died with COVID-19 — United States, February 12–May 18, 2020* (July 17, 2020) ("COVID-19 mortality is higher in persons with underlying medical conditions", which includes asthma), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e1.htm?s_cid=mm6928e1_w; *SARS-CoV-2–Associated Deaths Among Persons Aged <21 Years — United States, February 12–July 31, 2020* (Sept. 18, 2020) (75% of decedents had underlying health conditions, with chronic lung disease, including asthma, the most common such condition); *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6937e4.htm?s_cid=mm6937e4_w.

[27] Centers for Disease Control and Prevention, *Long-Term Effects of COVID-19* (updated Sept. 16, 2020) (highlighting emerging evidence that "many organs besides the lungs are affected by COVID-19", especially the heart) *available at* https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html; Mayo Clinic, *COVID-19 (coronavirus): Long-term effects* (Aug. 18, 2020) ("The virus can damage the lungs, heart and brain, which increases the risk of long-term health problems.") *available at* https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351; Oran, P., Topol, E., *Prevalence of SARS-CoV-2 Infection: a Narrative Review*, Annals of Internal Medicine 173:5 (Sept. 1, 2020) (noting "disturbing" finding that 54% of asymptomatic persons infected with COVID-19 in the study showed "significant subclinical abnormalities in their lungs") *available at* https://www.acpjournals.org/doi/10.7326/M20-3012?cookieSet=1.

[28] Leonhardt, M., *Could Covid-19 be considered a preexisting condition? It's complicated.*, CNBC.com (Sept. 28, 2020) (acknowledging potential for health insurers to treat COVID-19 as preexisting condition), *available at* https://www.cnbc.com/2020/09/28/could-covid-19-be-considered-a-preexisting-condition.html.

## V. CONCLUSION

For the foregoing reasons, we respectfully request that the Court opt for a non-custodial

sentence in this case.


Date:  Sept. 30, 2020


s/Walter F. McKee
WALTER F. MCKEE
McKee Law, P.A.
133 State Street
Augusta, ME.   04330
(207) 620-8294

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on September 30, 2020, I electronically filed the (Redacted) Sentencing Memorandum with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:  United States Attorney's Office, Portland, Maine.

Date:  Sept. 30, 2020

                      <u>s/Walter F. McKee</u>
                      WALTER F. MCKEE
                      McKee Law, P.A.
                      133 State Street
                      Augusta, ME.   04330
                      (207) 620-8294